## MARKET STREET RAILWAY CO. *v.* RAILROAD COMMISSION OF CALIFORNIA ET AL.

Nos. 510 and 511. Argued February 26, 1945.—Decided March 26, 1945.

*Mr. Francis R. Kirkham,* with whom *Messrs. Cyril Appel* and *Felix T. Smith* were on the brief, for appellant.

*Mr. Everett C. McKeage,* with whom *Mr. Wyman C. Knapp* was on the brief, for appellees.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Two appeals have been taken from a single judgment of the Supreme Court of California because counsel was

uncertain when the judgment became final for our juris-
dictional purposes. The decision was rendered July 1,
1944; it concluded, "The order is affirmed"; a petition for
rehearing was denied July 27, 1944. The first appeal was
applied for and allowed on July 31, 1944. If the judgment
became final on denial of rehearing, this appeal was
timely. However, the California Rules on Appeal ex-
pressly provide that a decision of the Supreme Court "be-
comes final thirty days after filing unless otherwise
ordered prior to the expiration of said 30-day period." [1]
Remittitur does not issue until the end of the 30-day
period.[2] It issued on August 1 and certified, according to
practice, that "the foregoing is a true copy of an original
judgment entered in the above entitled cause on the 1st
day of July, 1944; and now remaining of record in my

---

[1] Rule 24 (a) provides: "[When decisions become final] All de-
cisions of the reviewing courts shall be filed with the clerk. A decision
of the Supreme Court becomes final 30 days after filing unless other-
wise ordered prior to the expiration of said 30-day period. Pursuant
to article VI, section 4c, of the Constitution, a decision of a District
Court of Appeal becomes final as to that court, 30 days in civil cases
and 15 days in criminal cases after filing, and thereafter is not subject
to modification or rehearing by said court. Where an opinion is
modified without change in the judgment, during the time allowed
for rehearing, such modification shall not postpone the time that the
decision becomes final as above provided; but if the judgment is
modified during that time, the period specified herein begins to run
anew, as of the date of modification." Rules on Appeal for the
Supreme Court and District Courts of Appeal of the State of Cali-
fornia, effective July 1, 1943. See 22 Cal. 2d 1.

[2] Rule 25 so provides. "A remittitur shall issue after the final de-
termination of any appeal, or of any original proceeding in review in
which an alternative writ or order to show cause has been issued. Un-
less otherwise ordered, the clerk of the Supreme Court shall issue the
remittitur when a judgment of that court becomes final . . ." Rule
25 (a). "For good cause shown, or on stipulation of the parties, the
Supreme Court may direct the immediate issuance of a remittitur."
Rule 25 (b). For discussion of this rule see Witkin, *New California
Rules on Appeal* (1944) 17 So. Calif. L. Rev. 248 *et seq.*

office." If the date of its issue, being also the date of finality fixed by the rule, governs finality for purposes of our jurisdiction, the judgment was not a final one at the time the first appeal was granted. On the chance that it might be dismissed as premature, a second appeal was presented and allowed on September 21.

Our jurisdiction to review a state court judgment is confined by long-standing statute to one which is final. Judicial Code, § 237, 28 U. S. C. § 344. Final it must be in two senses: it must be subject to no further review or correction in any other state tribunal; it must also be final as an effective determination of the litigation and not of merely interlocutory or intermediate steps therein. It must be the final word of a final court.

We have held that finality of a judgment of a state court for determining the time within which our jurisdiction to review may be invoked is not controlled by the designation applied in state practice. *Department of Banking* v. *Pink,* 317 U. S. 264; *Cole* v. *Violette,* 319 U. S. 581. The judgment for our purposes is final when the issues are adjudged. Such finality is not deferred by the existence of a latent power in the rendering court to reopen or revise its judgment. The waiting period prescribed by the statute here seems to reserve a power of that character. The decision during this period does not lack the attributes of an adjudication, it is not awaiting lapse of time to become a judgment, it merely is subject to modification. When this period runs, unless the court has moved meanwhile, it becomes powerless to change or modify the judgment. *Oakland* v. *Pacific Coast Lumber Co.,* 172 Cal. 332, 337, 156 P. 468; *Estate of Ross,* 189 Cal. 317, 318, 207 P. 1014. The rule is thus a limitation on the time during which the court may reconsider, which in absence of such rule might expire only with the end of the term or some other event determinative under local law. Such latent powers of state courts over their judgments

are too variable and indeterminate to serve as tests of our jurisdiction. Our test is a practical one. When the case is decided, the time to seek our review begins to run. A timely petition for rehearing defers finality for our purposes until it is acted upon or until power to act upon it has expired as here it would appear to do at the end of the 30-day period.[3]  If rehearing is granted, the judgment is opened, and does not become final as a prerequisite to application for review by us until decision is rendered upon rehearing.

We postponed consideration of jurisdiction until hearing on the merits.[4]  We hold that this judgment became final on denial of rehearing, that the first appeal was timely and that the precautionary second appeal is duplication. Accordingly the appeal in No. 511 is dismissed and that in No. 510 is entertained upon its merits.

The Market Street Railway Company at the commencement of these proceedings operated a system of passenger transportation by street car and by bus in San Francisco and its environs. The Railroad Commission of California instituted on its own motion an inquiry into the Company's rates and service. After hearings, an order

---

[3] "The Supreme Court or a District Court of Appeal may grant a rehearing in any cause after its own decision; and any cause pending in a department of the Supreme Court may be ordered heard by the Supreme Court in bank. A rehearing or hearing in bank may be granted on petition, as provided in subdivision (b) of this rule, or on the court's own motion, prior to the time the decision becomes final therein." Rule 27 (a).

"An order of the Supreme Court granting a rehearing shall be signed by at least 4 justices assenting thereto, and filed with the clerk; and a hearing in bank after decision in department may be ordered as provided in article VI, section 2, of the Constitution. If no order is made before the decision becomes final, the petition shall be deemed denied, and the clerk shall enter a notation in the register to that effect." Rule 27 (e).

[4] November 13, 1944.

was promulgated reducing the fare from seven to six cents.[5] The Company, after rehearing was denied,[6] obtained review by the Supreme Court of California. It also obtained a stay of the Commission's order, conditioned upon impounding the disputed one cent per passenger to abide settlement of the issues upon which its ownership would depend. The Supreme Court of California affirmed the order [7] and appeal is taken to this Court. Meanwhile the Company sold its operative properties to the City of San Francisco. The case is saved from being moot only because its decision is necessary to determine whether the Company is entitled to the impounded portion of the fares or whether the money shall be refunded to passengers making claims and unclaimed amounts thereof be paid over to the state, as required by conditions of the stay order.

The appeal raises constitutional issues only. The contention is that the order deprives the appellant of its property without due process of law, contrary to the Fourteenth Amendment. Appellant claims denials of due process in matters of procedure in that it had no adequate notice that its rates were under attack or adequate opportunity for a hearing thereon, that the order in several vital particulars is not supported by substantial evidence or by any evidence, and that it was improperly based on matters outside of the record on which there was no opportunity to cross-examine or to be heard. It claims a taking of its property as a result of the order on the ground that it would force the Company to operate at a loss because the Commission used a rate base of $7,950,000, the price at which appellant had offered to sell its operative properties to the City, and did not consider reproduction cost,

---

[5] The opinions are reported in 45 Cal. R. C. Dec. 53.

[6] The opinion on rehearing is reported in 45 Cal. R. C. Dec. 162.

[7] The Court's opinion is reported in 24 Cal. 2d 378, 150 P. 2d 196.

historical cost, prudent investment, or capitalization bases, on any of which under conventional accounting the six-cent fare would produce no return on its property and would force a substantial operating deficit upon the Company.

The appellant in support of its contentions that it has been denied due process in procedure and has been subjected to an unconstitutional taking of its property invokes many decisions of this Court in which statements have been made that seem to support its contentions. But it should be noted at the outset that most of our cases deal with utilities which had earning opportunities, and public regulation curtailed earnings otherwise possible. But if there were no public regulation at all, this appellant would be a particularly ailing unit of a generally sick industry. The problem of reconciling the patrons' needs and the investors' rights in an enterprise that has passed its zenith of opportunity and usefulness, whose investment already is impaired by economic forces, and whose earning possibilities are already invaded by competition from other forms of transportation, is quite a different problem. The Company's practical situation throws important light both on the question whether the rate reduction has taken its property and also upon the criticisms it makes of the conduct of the hearings.

Transportation history of San Francisco follows a pattern not unfamiliar. This property has passed through cycles of competition, consolidation and monopoly, and new forms of competition; it has seen days of prosperity, decline, and salvage. In the 1850's an omnibus service began to operate in San Francisco. In the 1860's came the horse car. The 1870's saw the beginning of the cable car, for which the contour of the city was peculiarly adapted. The Market Street Railway Company was incorporated in 1893 and took over 11 of the 17 street car lines then independently operated in the city. In 1902, United

Railroads of San Francisco was organized. This consolidated under one operating control properties of the Market Street Company and five other lines, comprising 229 miles of track, much of which was cable-operated. It suffered greatly from the earthquake and fire of 1906, but carried out a considerable program of reconstruction between 1906 and 1910. In 1921 it failed to pay interest on outstanding bonds. Bondholders acquired the properties and revived the Market Street Railway Company, which had been a dormant subsidiary of United, to operate them.

In 1912 the City and County of San Francisco began operation of a municipal street railway line. This line is not and never has been under the Railroad Commission's jurisdiction. It expanded rapidly, its routes in some instances parallel those of appellant, and its competition has been serious. Throughout the period of competition the municipal lines have operated on a five-cent fare. The Market Street Line also operated on a five-cent fare until July 6, 1937. In that year it applied to the Commission for an increase to a seven-cent fare. This was denied, but a two-cent transfer charge and other adjustments were authorized. In March 1938 the Company again petitioned for a seven-cent fare, with reduction for school children. The Commission authorized a seven-cent fare, but required some concession to token buyers. A few months later the Company again asked a straight seven-cent fare and relief from the token rate. The Commission directed the Company to apply to the City for permission to abandon certain lines and to protect it against "jitney competition," stipulating that the seven-cent fare could be made effective if the City failed to respond. The City did not act, and the seven-cent fare became effective January 1, 1939.

But the increase of fare brought no increase of revenue. Both traffic and revenue continued to decline, and in 1941 reached the lowest point in twenty years. Then came

war, bringing accelerated activity, increase of population of the city, rubber and gas shortage, restrictions on purchase of new and retirement of many old automobiles. Traffic and revenues showed a sudden increase. The Commission found, however, that the service had constantly deteriorated and was worse under the seven-cent fare than under the former five-cent rate. It recognized that some of the causes were beyond the Company's control. But after allowance for those causes, it also found evidence of long-time neglect, mismanagement, and indifference to urgent public need. It found the Company's service inferior to the service of the municipal lines, although appellant charged a 40 per cent higher fare. Defects in service consisted of failure to operate on schedule, long intervals between cars, followed by several cars operating with little headway, overloading, inadequate inspection, and inadequately maintained rolling stock. The Company had some 70 cars out of operation and in storage because of shortage of manpower. Its street car rolling stock was obsolete, 73 electric cars and 12 cable cars being out of service. None of the cars was modern. The municipal lines had tried to lease the unused cars for operation on its lines, but the Company refused. The City was denied priorities for purchase of new busses by federal authorities because of idle rolling stock in the city. The Commission concluded that the reason for the Company's declining to lease for a fair rental rolling stock it could not use was fear of competition. The Company was handicapped in manpower, the municipal lines offering somewhat better wages and working conditions that seemed more attractive. The entire system was suffering from deferred maintenance, the amount expended for way and structures maintenance having been steadily reduced, both in dollars and in proportion of total operating costs.

The Commission disagreed with the Company as to the use to be made of war-time increase in revenues. The

Company said it had no definite plan for setting aside anything for maintenance. The management thought its first obligation was to discharge its debts. The Commission took the view that allowances for depreciation as part of the costs of operation should be spent in replacement of depreciated property, and not for payment of debts.

Reviewing the financial results of fare increases, the Commission concluded that the Company would reap no lasting benefit from rates in excess of five cents, due to the tendency of a higher rate to discourage patronage. The war traffic the Commission thought temporary. But it concluded that a six-cent fare would sufficiently stimulate traffic to leave after operating expenses approximately a six per cent return on a rate base of $7,950,000. This was the figure at which the Company had offered to sell its operative properties to the City. Accordingly the Commission found the six cents to be a reasonable rate to the Company and to be all or more than the reasonable value of the services being rendered to patrons. It considered this rate to be experimental and kept the proceeding open for such further orders as might be just and reasonable. The Company applied for rehearing on substantially the grounds it urges here. Its arguments were considered at length in an opinion which denied rehearing. The Supreme Court of California overruled all of the Company's objections and affirmed the Commission's order.

The reduced rate never took effect. The Company obtained delay from the Commission and a stay order from the Court. It then sold its properties to the City, which took over and continued the seven-cent fare. So the anticipations of the Commission as to increased patronage from the rate reduction never have been put to the test of experience. Our review considers only whether the order was valid when and as made.

1. Appellant says that the order is invalid because it was denied a fair hearing, given no adequate notice that its rates were under attack, and hence was afforded no opportunity for a hearing on the reasonableness of its rates. We find this contention to have no foundation in the record. The order of the Commission instituting the proceeding recited its belief "that public interest demands an inquiry into the reasonableness of the rates, as well as the sufficiency and adequacy of the service rendered" by appellant, and investigation was ordered of both. Due notice of the proceeding was given and it was entitled an investigation "into the reasonableness of the rates and charges, and into the sufficiency and adequacy of the" service. The hearing was opened with a similar statement by the Commission. The record is replete with evidence that would have no bearing on the questions of service except as fares were involved. Experts of the Commission testified at length as to financial history and rate experience of the Company. The Company's president testified concerning the rate situation and the Company's experience with the seven-cent fare. Its counsel put in evidence the Commission's former decisions authorizing increases in fares.

The Company particularly complains that it had no notice that the Commission was receiving evidence of its offer to sell its properties for $7,950,000 for use as a rate base. The offer was received in evidence without limitation or statement of its purpose. Nothing appears to mislead or entrap the Company or to lull it into a sense of security. It seems simply to have assumed that no explanation of the offer was necessary. Doubtless the decision and the grounds of decision were unexpected. But surprise is not necessarily want of due process.

We find that the Company had reasonable notice that its rates were under attack and was not denied opportunity to be heard thereon. We can well understand how

counsel's attention became diverted to more sharply contested aspects of the case. But even if a more convincing showing were made that the Company had relevant evidence to be heard, we find no adequate excuse for the failure to offer it in the proceeding. No offer was rejected, no request for time to obtain such evidence was denied. A misapprehension by a litigant of the steps which its best interests require during a trial may be appealing grounds for a plea to the discretion of the hearing tribunal for another chance, but it is not grounds for our interference as a denial of constitutional rights.

2. It is next contended that the order is invalid under the due process clause because it is unsupported by evidence and is based on the Commission's speculation and conjecture. This charge relates particularly to those findings which predict the effect of a rate reduction in stimulating traffic. The Commission's estimates and predictions do not follow any particular testimony. Appellant urges that such predictive findings may be made only on expert testimony, subject to cross-examination, explanation, and rebuttal, and may not be based on the Commission's own expert knowledge. Various considerations are advanced to show that the Commission's predictions were based on innocent analysis and were improbable.

Appellant relies upon our holding in *Ohio Bell Telephone Co.* v. *Public Utilities Commission,* 301 U. S. 292. In that case the Commission ordered refunds "upon the strength of evidential facts not spread upon the record." This consisted "of information secretly collected and never yet disclosed. The company protested. It asked disclosure of the documents indicative of price trends, and an opportunity to examine them, to analyze them, to explain and to rebut them. The response was a curt refusal. Upon the strength of these unknown documents refunds have been ordered for sums mounting into millions, the Commission reporting its conclusion, but not the under-

lying proofs. The putative debtor does not know the proofs today. This is not the fair hearing essential to due process. It is condemnation without trial." *Id.* at 300. Nothing of that kind occurred in this case. The basis for a judgment is here in the record. The Company itself put in evidence decisions by the Commission in which by cautious steps it permitted advance of the rates from five to seven cents. Traffic records before and after each advance are in evidence. Also in the record is the traffic experience of the competing municipal line, which did not increase its fares and which did not suffer declines in traffic and revenues comparable to those which followed this Company's increase of fares. This is not a case where the data basic to a judgment have been withheld from the record. The complaint is that the Commission formed its own conclusions without the aid of expert opinions. It is contended that the Commission should draw conclusions from these facts only upon hearing testimony of experts as to the conclusions they would draw from the facts of record. Experts' judgments, however, would not bind the Commission. Their testimony would be in the nature of argument or opinion, and the weight to be given it would depend upon the Commission's estimate of the reasonableness of their conclusions and the force of their reasoning. There is nothing to indicate that any consideration which could be advanced by an expert has not been advanced by the Company in argument and fully weighed.

We cannot say that it is a denial of due process for a commission so experienced as the record shows this Commission to have been with the affairs of this particular appellant to draw inferences as to the probable effect on traffic of a given rate decrease on such a record as we have here. Particularly would a conclusion of denial of due process be unwarranted where, as here, the Commission

recognized the infirmity of any predictions, regarded its rate order as a temporary experiment for which no fixed period was set, and held open the proceeding to receive whatever lessons experience might teach. Its step here is after all only receding, on experience, from steps it earlier had taken to advance the rate, which also had been regarded as experimental and as to which experience had disappointed expectations. We find no denial of due process in these circumstances from the fact that the Commission evaluated the Company's experience for itself without the aid of expert testimony.

3. It also is urged that the order is invalid under the due process clause because it is based on matters outside the record. The decision of the Commission stated that "In the eight months' period, January to August, inclusive, of 1943 the operating revenues of the company amounted to $5,689,775," and compared this with the operating revenues for the same period of 1942 and found an increase of 20 per cent. On this basis it estimated the total for the full year of 1943 under the prevailing seven-cent fare. Challenged upon the ground that the operating revenues from January to August of 1943 were not in the record, the Commission admitted that these figures were taken from the appellant's monthly reports filed with the Commission. It contended that even if it was in error to refer to such reports, the error was harmless, since the record without the figures supported the reasonableness of the six-cent fare and it was therefore immaterial that the Commission used some additional figures. No contention is made here that the information was erroneous or was misunderstood by the Commission, and no contention is made that the Company could have disproved it or explained away its effect for the purpose for which the Commission used it. The most that can be said is that the Commission in making its predictive findings went out-

side of the record to verify its judgment by reference to actual traffic figures that became available only after the hearings closed. It does not appear that the Company was in any way prejudiced thereby, and it makes no showing that, if a rehearing were held to introduce its own reports, it would gain much by cross-examination, rebuttal, or impeachment of its own auditors or the reports they had filed. Due process, of course, requires that commissions proceed upon matters in evidence and that parties have opportunity to subject evidence to the test of cross-examination and rebuttal. But due process deals with matters of substance and is not to be trivialized by formal objections that have no substantial bearing on the ultimate rights of parties. The process of keeping informed as to regulated utilities is a continuous matter with commissions. We are unwilling to say that such an incidental reference as we have here to a party's own reports, although not formally marked in evidence in the proceeding, in the absence of any showing of error or prejudice constitutes a want of due process.

4. The order is said to be invalid under the due process clause because it is based in part on the so-called "value of service" theory. It is urged that "a confiscatory rate cannot be sustained on the theory that it is an adequate price for the service independently valued" and there is no evidence justifying a rate reduction on the theory of the value of the service.

The question whether a confiscatory rate can be justified because service is bad can only be reached when we find a prescribed rate to be confiscatory. As we do not find this rate to be such, we do not need to pronounce upon the abstract doctrine as to the validity of the "value of service" theory as justifying rates that do not yield a fair return. The Commission in this case did not make an independent valuation of the service to patrons and fix rates accordingly.

The consideration of service as a justification for rates arises in this case upon a comparison of the service of the Company under the five-cent rate and under the seven-cent rate. The Commission found that the 40 per cent increase of rate had been accompanied by a deterioration of service. Some factors in the bad service were beyond the Company's control; others were found not to be without remedy by good management. Certainly if the increased fare had been accompanied by an improved service, it would be used as an argument by the Company, and a powerful one it would be, for the continuance of the higher rate. That higher rates failed to improve, failed even to maintain, service certainly removed one of the justifications for the increase which the Company was enjoying. It must not be forgotten that the increases that the Commission had allowed were also experimental. So far as the public was concerned the experiment with the seven-cent rate yielded them no better immediate service and, because of the Company's policies, gave them no prospect of more permanent service. In fact, by discouragement of patronage it threatened the continuance of the service.

Under these circumstances the Commission did not put a monetary value on a street car ride as the basis of the fare. Using the Company's service under the five-cent fare as a standard, it found that the public—aside from the service to war plants, which was admittedly good—was receiving no more transportation service for seven cents than it had received at five, and at the same time the Company was not receiving increased revenues because the price of the service had exceeded the value that the public put upon it and it had thereby withdrawn its patronage.

Certainly the due process clause of the Constitution is not violated when a commission takes into consideration practical results to the public of advances which it has allowed in rates. To the extent that the Commission was

influenced by considerations of the value of the service in this case, we find nothing that denies the Company any rights possessed under the Federal Constitution.

5. The order is asserted to be invalid because it is said to be confiscatory and to compel appellant to operate at a loss. The Commission used a rate base of $7,950,000, the price at which the property had been offered to the City, and the six-cent rate is not calculated to permit any return on a greater valuation. Before we consider the validity of this rate base, we may well consider what alternatives the case presents. No study of the present cost of reproduction is shown, no present fair value is suggested. Nor do we think it important. Apart from familiar objections to the reproduction-cost method, no responsible person would think of reproducing the present plant, consisting in substantial part of cable cars and obsolete equipment. There is no basis for assuming that anyone, in the light of conditions which prevail in the street-surface railroad industry generally, would consider reproducing any street railway system. It was no constitutional error to proceed to fix a rate in disregard of theoretical reproduction costs.

The Commission in 1920 made a valuation study of appellant's properties and found an historical reproduction cost of road and equipment to be $29,715,147. This valuation, brought forward by adding additions and betterments and deducting retirements, shows a total amount for road and equipment as of December 31, 1942 of $25,343,543.

Actual investment is not disclosed by the record. It does disclose that the book value of appellant's properties as of December 31, 1942 was $41,768,505.20.

The Company's outstanding securities at the end of 1942, issued with the approval of the Commission, totaled $37,921,323.96 at face value. They consisted of common stock of over $10,000,000; 3 different classes of preferred

stock of $21,000,000; first mortgage bonds of $4,217,500; equipment notes of $735,748.28; and additional long-term debt of $1,041,625.68.

Not one of these nor any combination of them affords a practical or possible rate base, nor does the Company suggest that allowance of any rate will earn it a return upon any of these. It has not itself ventured to ask a rate higher than seven cents, although the inadequacy of its yield to take care of the financial requirements of the Company has for some time been apparent. This company obviously is up against a sort of law of diminishing returns; the greater amount it collects per ride, the less amount it collects per car mile. It has long been recognized that this form of transportation could be preserved only by the most complete cooperation between management and public and the most enlightened efforts to make the service attractive to patrons.[8]  It is obvious that, for whatever

---

[8] In May of 1919 the Secretary of Commerce and the Secretary of Labor joined in a letter to President Wilson, advising him that 50 or more urban street railway systems representing a considerable percentage of the electric railway mileage was in the hands of receivers, affecting some of the largest cities of the country, and that other systems were on the verge of insolvency and the industry as a whole was virtually bankrupt. They urged the appointment of a commission to study and report upon the problem. President Wilson on June 1, 1919 named a commission which held extensive public hearings. The first witness was ex-President William Howard Taft, speaking for the National War Labor Board, and others, including leading municipal and railway officials and such experienced persons in the problem of regulation as Newton D. Baker, Milo R. Maltbie, Morris L. Cook, Joseph B. Eastman, and many others. Proceedings of the Federal Electric Railways Commission, v. 1. An exhaustive report with many recommendations was made. See Analysis of the Electric Railway Problem prepared for the Federal Electric Railways Commission by De Los F. Wilcox, New York City, 1921. Its recommendations were extensive, including certain changes both by the municipalities and by the companies affected. The recommendations were not generally heeded by either.

cause, the appellant has not succeeded in maintaining its service on a paying basis.

It is idle to discuss holdings of cases or to distinguish quotations in decisions of this or other courts which have dealt with utilities whose economic situation would yield a permanent profit, denied or limited only by public regulation. While the Company does not assert that it would be economically practicable to obtain a return on its investment, it strongly contends that the order is confiscatory by the tests of *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 603, 605, from which it claims to be entitled to a return "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital" and to "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." Those considerations, advanced in that case (which was reviewed pursuant to statute rather than under the Fourteenth Amendment), concerned a company which had advantage of an economic position which promised to yield what was held to be an excessive return on its investment and on its securities. They obviously are inapplicable to a company whose financial integrity already is hopelessly undermined, which could not attract capital on any possible rate, and where investors recognize as lost a part of what they have put in. It was noted in the *Hope Natural Gas* case that regulation does not assure that the regulated business make a profit. 320 U. S. at 603; see *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 590. All that was held was that a company could not complain if the return which was allowed made it possible for the company to operate successfully. There was no suggestion that less might not be allowed when the amount allowed was all that the company could earn.

Without analyzing rate cases in detail, it may be safely generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, or on an investment after it has vanished, even if once prudently made, or to maintain the credit of a concern whose securities already are impaired. The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces.

The owners of a property dedicated to the public service cannot be said to suffer injury if a rate is fixed for an experimental period, which probably will produce a fair return on the present fair value of their property. If it has lost all value except salvage, they suffer no loss if they earn a return on salvage value. If the property has no prospect of salvage except through dismantling and sale for scrap, the scrap value for such of it as is to be scrapped may represent its present worth. In this case the owners were fortunate in having a potential buyer. Negotiations had long been under way. The operative properties were twice offered to the City of San Francisco for $7,950,000 and twice the voters rejected the proposition. Ultimately the properties were sold for $7,500,000. The evidence shows that the president of the Company reported to the directors "that the price mentioned is the amount that has been agreed upon for the purchase by the City and County of San Francisco of the operative properties of the Company after negotiations in respect thereto which covered a considerable period of time and, as previously mentioned, is the best price obtainable therefor."

Upon this understanding the Board of Directors ratified the offer and directed the officers to consummate it.

It is now contended that this offer was calculated by a capitalization of earning power and that this Court condemned such a basis of valuation in *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 601, when it said, "The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated." The pronouncement in the *Hope* case was directed to a situation where the demand for the service permitted such a range of choice in rates as would greatly affect the value of the property. No such choice appears open to the appellant. Apart from a little brief war-time prosperity, it seems doubtful whether any rate would yield appellant's operating expenses.

Under these circumstances we do not find that anything has been taken from the appellant by the impact of public regulation. If the expectations of the Commission as to traffic increase were well founded, it would earn under this rate on the salvage value of its property, which is the only value it is shown to have. If expectations of increased traffic were unfounded, it could probably not earn a return from any rate that could be devised. We are unable to find that the order in this case is in violation of constitutional prohibitions, however unfortunate the plight of the appellant.

6. The Company also contends that it is entitled to reversal because the order contemplated a test of experience, and the experiment has not taken place, and the Commission's predictions cannot be verified. However, it was the Company which defeated the experiment. A very short trial—a period much shorter than is required to conduct a litigation—would have indicated the effect

of the rate reduction in stimulating traffic. But at the Company's request the experiment was stayed and then totally frustrated by the sale of the property. Under these circumstances the unavailability of experience to test the order cannot affect its validity. It might be grounds for an appeal to the discretion of the tribunal which rendered the order. It certainly is not a constitutional objection to be enforced by us.

The fixing of future rates always involves an element of prediction. Even monopolies must sell their services in a market where there is competition for the consumer's dollar and the price of a commodity affects its demand and use. This effect may be predicted or projected, but it can be known only from experience. The many detailed objections which the Company makes to the Commission's computations of probable yield would be answered by experience. There is nothing in the order which requires that the test period should be a year or any definite time, and there is no ground for assuming that the Commission would have rejected an application to make such changes in the schedule as experience might show to be necessary, in order to produce, if possible, the revenue which it found to be needed. The Commission had not in the past been indifferent to appellant's fiscal problems. Under such circumstances we think it is not forbidden by the Constitution that there be a pragmatic test of matters which even the most expert could not know in advance. Cf. *Clark's Ferry Bridge Co.* v. *Public Service Commission*, 291 U. S. 227.

We have considered appellant's complaints in considerable detail because the case in so many ways departs from the usual rate case. We find no constitutional infirmity in the result or in the procedure by which it is reached. The judgment of the Supreme Court of California is therefore

*Affirmed.*