**688**

The CINCINNATI GAS & ELECTRIC COMPANY, and The Union Light, Heat and Power Company, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

United Fuel Gas Company and Central Kentucky Natural Gas Company, Intervenors,

Commonwealth Natural Gas Corporation, Intervenor.

No. 13515.

United States Court of Appeals District of Columbia Circuit.

Argued April 8, 1957.
Decided June 3, 1957.

Petition for Rehearing Denied July 3, 1957.

See also 100 U.S.App.D.C. ——, 246 F.2d 694.

Mr. Walter E. Beckjord, Cincinnati, Ohio, with whom Mr. Valentine B. Deale, Washington, D. C., was on the brief, for petitioners.

Mr. Howard E. Wahrenbrock, Asst. General Counsel, Federal Power Commission, with whom Messrs. Willard W. Gatchell, General Counsel, Federal Power Commission, W. Russell Gorman, Asst. General Counsel, Federal Power Commission, and David S. Lichtenstein, Attorney, Federal Power Commission, were on the brief, for respondent.

Mr. Richard A. Rosan, New York City, with whom Mr. John P. Randolph was on the brief, for intervenors, United Fuel Gas Co. and Central Kentucky Natural Gas Co.

Mr. Stanley M. Morley, Washington, D. C., and Mr. James O. Watts, Jr., Lynchburg, Va., were on the brief for intervenor, Commonwealth Natural Gas Corp.

Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

■ Cincinnati Gas & Electric Company and its subsidiary, Union Light,

Heat and Power Company,[1] are retail distributors of natural gas purchased at wholesale from Central Kentucky Natural Gas Company. They petition for review and modification of an order of the Federal Power Commission which permitted Central Kentucky and its affiliated supplier, United Fuel Gas Company, to change their demand-commodity rate form by providing for a contract demand over a long term. Under the new form, the billing demand is not to exceed, nor be less than 90 per cent of, a quantity of gas to be agreed upon by the seller and buyer as an estimate of the buyer's maximum-day requirement during the term of the contract between them—usually 20 years.[2] In the rate form previously in effect, the demand charge was based in general on actual maximum-day demand during the twelvemonth ending with the month of billing or on the average daily demand during the peak month of that period.

The order in question was entered in consolidated proceedings which originated when Central Kentucky and United Fuel filed with the Commission new tariffs providing for substantial increases in both demand and commodity charges, and for the long-term contract demand to which we have referred. At the request of Cincinnati-Union and another, the Commission ordered a hearing limited to the contract demand element of the proposed rate form, and reserved for future hearing and consideration all other issues concerning the new tariffs, including of course the proposed increases in the demand and commodity charges.

After a thorough hearing, in which Cincinnati-Union opposed the entire contract demand provision, the examiner filed a comprehensive opinion, and made detailed findings of fact upon the basis of which he approved the proposed contract demand form. The Commission conducted an *en banc* hearing on exceptions to the examiner's initial decision, following which it approved his action and filed an opinion setting forth at some length its reasons for doing so. We summarize those reasons by selecting language from the opinion without indicating occasional omissions of material in the interest of brevity:

"[T]he primary fact influencing our determination is the magnitude of growth of the space-heating load in the area served by the distribution customers of United Fuel and Central Kentucky. The record shows that not only has this space-heating load mushroomed in the past few years but also that the growth is continuing. The record shows that the design capacity of United Fuel and Central Kentucky is fully utilized only once in approximately every eight years. This capacity is installed on the basis of estimated peak demands of their customers which in turn base their peak estimates upon cold weather conditions occurring, on an average, once in eight years. These annual weather variations result in a 'feast or famine' recovery by United Fuel and Central Kentucky of costs collected through demand charges. The CD [contract demand] rate form will tend to stabilize recovery of these costs.

"The second element in the CD rate form, the length of the term of commitment, also plays a part in our decision. A one-year or other short-

1. They will be referred to collectively as Cincinnati-Union or as the petitioners.

2. Other provisions of the Commission-approved proposal (a) imposed penalties on the buyer for unauthorized takes in excess of the agreed maximum, and on the seller for failure to deliver the maximum when required; (b) required the seller to increase the contract quantity on the buyer's request if supply and facilities permitted and, if not, to use due diligence to provide them; (c) permitted the buyer to reduce the maximum-day quantity by 10 per cent during the term of the contract in steps of five per cent in one year; and (d) permitted the seller and buyer further to reduce by agreement the maximum-day quantity if other use could be made of the seller's capacity thereby released.

term contract would defeat the purposes of the CD rate forms, since it would not minimize the effect of the year-to-year fluctuations in the demand. It would neither stabilize earnings nor encourage use of peak shaving by customers. We do not feel that a commitment over the life of the contract is unreasonable, particularly when it is remembered that our scrutiny in the rate-making process is a continual one.

"The demand revenues accruing through the contracted billing demand charge will not assure United Fuel and Central Kentucky of all fixed costs incurred for the benefit of the customer companies. Obviously, the demand charge which finally results from the second stage of these proceedings will not reflect all fixed costs of United Fuel and Central Kentucky. Of course the rate level, as well as the amount of the demand charge, awaits our further determination."

In addition to adopting the findings of the examiner with respect to the matters discussed in its opinion,[3] the Commission made the following express finding:

"Continued billing by United Fuel and Central Kentucky under rate forms previously prescribed does not give sufficient firmness to the demand charges nor provide for long-term commitments by the customers both of which are essential for continued financial stability of United Fuel and Central Kentucky; nor does such billing encourage use of peak shaving by the customers. Therefore, further use of these rate forms would not be in the public interest."

As we have noted, the petitioners objected to the entire contract demand billing formula in the hearing before the examiner. But, as their objection was primarily to the long-term billing commitment feature, they tell us in their brief that before the Commission "they took exception to the long term billing commitment features and the extension of the commitment to the electric opera-

3. We reproduce those findings of the examiner:

"(6) Long-term contracts for essential southwest gas and the facilities required (a) to meet annual requirements and (b) to have capacity available to meet the estimated maximum peak day have created for United Fuel and Central Kentucky rigid costs of tremendous magnitude.

"(7) The CD rate forms filed by United Fuel and Central Kentucky, as amended, seek to recoup through a minimum billing demand a portion of the costs incurred for having capacity available irrespective of the usage of capacity, and reliable evidence shows that such recoupment has become increasingly necessary as the space heating load has grown and demand revenues (without a CD floor under them) fluctuate more and more in unison with temperature variations.

"(8) The growth of the space heating load of the wholesale customers of United Fuel and Central Kentucky has intensified the necessity of recovering minimum demand revenues from their wholesale customers as provided in the proposed CD rate form as hereinafter further amended in paragraph (C).

"(9) The proposed rate forms as amended recognize the present characteristics of the natural gas industry.

"(10) The proposed CD rate forms as amended distribute demand costs between the wholesale customers of United Fuel and Central Kentucky, with appropriate leeway, in accordance with customer-responsibility therefor.

"(11) The proposed CD rate forms as amended are just and reasonable as between United Fuel and Central Kentucky and their customers and as between the customers themselves.

"(12) Based upon the informed judgment of competent witnesses reflected in the record, it is reasonable to conclude that the proposed CD rate forms as amended are just and reasonable since they are, among other things, based upon the financial and operating necessities of the gas business of United Fuel and Central Kentucky.

"(13) The filed CD * * * rate forms of United Fuel and Central Kentucky, together with the revisions of such rate forms, being just, reasonable, non-discriminatory and non-preferential, it is appropriate that they be approved as amended."

tions and in effect waived their objections to the Contract Demand rate form as to the short term." The petitioners say they favor a contract demand form "*so long as* the ratchet is effectively limited to a short term, such as twelve months, rather than twenty years."

Thus the petition for review is also limited in scope. Cincinnati-Union confine their attack to the long-term billing commitment feature of the contract demand. They say they are aggrieved by the Commission's order "insofar as it approved (a) the long term billing commitment feature of the contract demand rate form, and (b) the extension of that feature to the assets and revenues of your Petitioners' respective electric, as distinguished from gas, operations * * *." They pray therefore that we modify the Commission's order to provide for

"(i) The elimination of the long term billing commitment feature of the contract demand 'rate form' by limiting the ratchet on the billing demand to a 12 month period, rather than extending it over the life of the Service Agreement;

"(ii) The limitation of the extent of the long term billing commitments with Central Kentucky to the natural gas revenues, plant and assets of your Petitioners, and excluding therefrom the other, including electric revenues, plant and assets of your Petitioners."

Their statutory right to review of the order depends upon whether the petitioners actually are aggrieved by the portion of it they desire us to modify, which is the only portion of which they complain. Section 19(b) of the Natural Gas Act,[4] under which the petition for review was filed, provides that any party to a proceeding under the Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in this court or in any other appropriate court of appeals by seasona- bly filing a petition praying that the order of the Commission be modified or set aside in whole or in part.

It is therefore essential first to examine the allegations and arguments of the petitioners as to how they are aggrieved by the long-term billing commitment phase, to ascertain whether they have the standing to seek review upon which our jurisdiction depends. The petitioners particularize as to aggrievement due to the long-term billing commitment by making three allegations of injury which we shall discuss in separate numbered sections of this opinion.

1. They assert that the order unlawfully requires them to pay Central Kentucky minimum demand revenues over a long term, even though their gas requirements "might substantially decrease due to loss of business to competitive fuels and technologies." Although this is envisaged only as a possibility, the petitioners inconsistently say that "inevitably" the long-term commitment "will hasten the day of insolvency" for them, and is therefore unlawful under Market Street R. Co. v. Railroad Comm. of State of California, 1945, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171, and Spiegel v. Public Utilities Comm., 1955, 96 U.S.App.D.C. 307, 226 F.2d 29. In the Market Street case, only constitutional issues were raised. The railway company contended the rate reduction order complained of deprived it of its property without due process of law, contrary to the Fourteenth Amendment.

The Supreme Court pointed out that the railway company was a "particularly ailing unit of a generally sick industry" [324 U.S. 548, 65 S.Ct. 774] whose property had been reduced in value by economic forces beyond the possibility of regulatory repair, and upheld the Commission in using as a rate base the sum of $7,950,000 at which the physical property had been offered to the City of San Francisco. It was sold to the city for $7,500,000. In such circumstances historical cost, reproduction cost and pru-

4. 15 U.S.C.A. § 717r(b).

dent investment are not to be considered, said the Court.

This holding would not have applied to the ordinary metropolitan street railway company at the turn of the century, when the industry was flourishing and traction stocks had gilt edges, on the mere possibility of a drastically depressing economic change such as occurred with the advent of the automobile. The Market Street holding has no application, as the opinion shows, to a dynamic industry which is in the midst of phenomenal growth. In the Spiegel case we directed a remand to the Public Utilities Commission because it had not given an adequate statement of its reasons for adopting the original cost rate base. The case is inapposite here.

The petitioners do not allege that the long-term billing commitment will have any immediate unfavorable impact upon them. They do not contend it will force them to contract for a greater demand than they would agree to under a short term. In fact, they say the contrary. In discussing "a short term contract demand rate form," such as they propose, Cincinnati-Union state:

> " * * * The peak load varies from year to year, depending on the severity of the weather conditions. Accordingly, the peak load requirements are calculated on the basis of the most severe condition (referred to as the design peak day) that is likely to be encountered. A Contract Demand equal to that amount would be negotiated with Central Kentucky. * * * "

This means, of course, that in the absence of the long-term demand billing provision, Cincinnati-Union would nevertheless plan each year to meet the estimated demands of their customers at the lowest temperature which, on the average, may be expected to occur once in eight or ten years. This "design peak day" in the average year will be greater than the actual peak.

It is thus clear that Cincinnati-Union do not complain of any present injury from the long-term billing commitment provision. They rely upon the possibility that the natural gas business may become a sick industry, such as the street railway business was when the case of the Market Street Railway was before the Supreme Court. But the petitioners did not offer to show by expert opinion or otherwise that the natural gas industry faces such a fate in the foreseeable future. In fact, their own expert witness testified that he considers the gas business to be one of the more stable businesses of this country. They did not even allege that such a debacle is a probability, but were content to say it might happen. This is not enough. To adjust a rate form to the possibility that unanticipated disaster may come to a presently prosperous and stable industry is, we think, unjustifiable, particularly in view of the fact that the Federal Power Commission is empowered continuously to scrutinize the economic situation of companies subject to its regulation, with authority to act in the public interest at any time, and would of course give immediate consideration to any future complaint of injury through changed conditions. Cf. Federal Power Comm. v. Hope Natural Gas Co., 1944, 320 U.S. 591, 615, 64 S.Ct. 281, 88 L.Ed. 333.

What Cincinnati-Union seek here is present relief from an undemonstrable future danger. Their economic forebodings should be allayed now, they say. We think they are not presently aggrieved by the long-term billing commitment of the contract demand component in the approved rate form, merely because drastic economic changes now unforeseeable might occur during the term.

2. A second specification of aggrievement due to the long-term billing commitment is the allegation that the order unlawfully approves its extension to the revenues and assets of the electric operations of the petitioners; that is to say, Cincinnati-Union complain that the Commission refused to exclude their electric assets and revenues from liability to their gas creditors. If Cincinnati-Union

desire to place their electric departments beyond the reach of gas department creditors, they can easily do so by separately incorporating their electric and gas businesses, subject to the approval of local regulatory authorities having jurisdiction; that they have not done so is the result of their own choice.

But, even if the novel notion that they should be exempt from general corporate liability for gas debts incurred through the operation of the long-term billing commitment could be accepted, the Commission's refusal to grant such exemption does not presently aggrieve the petitioners. For the electric revenues and assets will not be called upon by gas creditors unless and until the gas industry suffers the sickness of the Market Street Railway, a contingency too remote and speculative to be the basis of rejecting the long-term billing commitment, as seen in the preceding section of this opinion. The petitioners therefore are not presently aggrieved in this respect by the long-term billing commitment, nor will they be in the future, unless and until they are "hastened into insolvency" by its operation.

3. Another specification of aggrievement due to the long-term contract demand is the allegation that, in approving it, the order unlawfully changes the gas service agreements between Central Kentucky and Cincinnati-Union "without the necessary finding that said agreements adversely affect the public interest under the Natural Gas Act." Although under the view we take of the case it is unnecessary to do so, we stop to discuss the merits of this contention. The petitioners rely upon United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, and Federal Power Comm. v. Sierra Pacific Power Co., 1956, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388, which hold, respectively, that the Natural Gas Act and the Federal Power Act do not give natural gas companies and power companies the right by their own unilateral action to change rates established by contract.

These cases are readily distinguishable from this one, for here the service agreement expressly contemplates future filings and there has been no unilateral change in rates fixed by contract. But, had there been, the Commission had the power to change the rate form as it did, provided it made the necessary finding. The Supreme Court said in the Sierra Power case, 350 U.S. at page 353, 76 S. Ct. at page 371:

> "* * * The Commission has undoubted power under § 206(a) [5] to prescribe a change in contract rates whenever it determines such rates to be unlawful. While this power is limited to prescribing the rate 'to be thereafter observed' and thus can effect no change prior to the date of the order, the Commission's order here, if based on the necessary findings, could have been effective to prescribe the proposed rate as the rate to be in effect prospectively from the date of the order, June 17, 1954. If the proceedings here satisfied in substance the requirements of § 206(a), it would seem immaterial that the investigation was begun as one into the reasonableness of the proposed rate rather than the existing contract rate.
>
> "The condition precedent to the Commission's exercise of its power under § 206(a) is a finding that the existing rate is 'unjust, unreasonable, unduly discriminatory or preferential'. * * *"

This condition precedent was met in the instant case. On the basis of the recitals in the Commission's express finding quoted earlier in this opinion, it concluded: "Therefore, further use of these rate forms [those previously prescribed] would not be in the public interest." It is immaterial, as the Supreme Court said, that the Commission began the investi-

5. Section 206(a) of the Federal Power Act, 16 U.S.C.A. § 824e(a), which is substantially identical with § 5(a) of the Natural Gas Act, 15 U.S.C.A. § 717d (a).

gation to inquire into the reasonableness of the contract demand which was to endure for the life of the contract, rather than the reasonableness of the previous rate form.

But even if the challenged portion of the order had prescribed the longer-term billing commitment contrary to the two Supreme Court cases, the jurisdictional question would remain: are the petitioners presently aggrieved thereby? They do not say the order impinges on any constitutional right. It follows that, for the reasons given in the foregoing discussion, the only aggrievement therefrom is that which might occur if the presently prosperous natural gas industry should fall upon evil times, with the long-term billing commitment still in effect although the Federal Power Commission had been standing by. As we have seen, this remote possibility is not present aggrievement.

■ We conclude that none of the petitioners' specifications as to how they are aggrieved by the portion of the order under attack is sufficient to give them the right to review under § 19(b) of the Act. This section means, we think, that a petitioner's aggrievement must be present and immediate, or at least must be demonstrably a looming unavoidable threat. It must be "immediately pressing," as the Supreme Court said in Eccles v. Peoples Bank, 1948, 333 U.S. 426, 432, 68 S.Ct. 641, 645, 92 L.Ed. 784, from which we quote:

"Thus the Bank seeks a declaration of its rights *if* it should lose its independence, or *if* the Board of Governors should reverse its policy and seek to invoke the condition even though the Bank remains independent and *if* then the Directors of the Federal Deposit Insurance Corporation should not change their policy not to grant deposit insurance to the Bank as a non-member of the Federal Reserve System. The concurrence of these contingent events,

necessary for injury to be realized, is too speculative to warrant anticipatory judicial determinations. Courts should avoid passing on questions of public law even short of constitutionality that are not immediately pressing. Many of the same reasons are present which impel them to abstain from adjudicating constitutional claims against a statute before it effectively and presently impinges on such claims."

Since the petitioners are not presently aggrieved by the portion of the order which they ask us to modify, their petition for review will be dismissed.[6]

So ordered.

---

6. Cf. Memphis Light, Gas & Water Division v. Federal Power Comm., 1957, 100 U.S. App.D.C. ——, 243 F.2d 628.