464 F.2d 804
 150 U.S.App.D.C. 295
 SOUTHEAST NEIGHBORS, INC. and Walter H. Dodd, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
WMA Transit Company, Intervenor.
Gilbert HAHN, Jr., Chairman, District of Columbia City
Council, Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
WMA Transit Company, Intervenor.
 Nos. 71-1244, 71-1391.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Dec. 3, 1971.
Decided June 15, 1972.
 
 Mrs. Jean Camper Cahn, Washington, D. C., submitted on the brief for petitioners in No. 71-1244. Mr. Charles H. Lohah, Washington, D. C., also entered an appearance for petitioners in No. 71-1244.
 Mr. Gilbert Hahn, Jr., Washington, D. C., with whom Mr. Edward B. Webb, Jr., Washington, D. C., was on the brief, for petitioner in No. 71-1391.
 Mr. Douglas N. Schneider, Jr., Washington, D. C., submitted on the brief for respondent in No. 71-1244. Mr. Stephen L. Sharfman also entered an appearance for respondent in No. 71-1244.
 Mr. Bernard Dobranski, Alexandria, Va., for respondent in No. 71-1391. Mr. Douglas N. Schneider, Jr., Washington, D. C., was on the brief for respondent in No. 71-1391.
 Mr. Stanley H. Kamerow, Washington, D. C., with whom Messrs. Allan L. Kamerow and Solomon L. Margolis, Washington, D. C., were on the brief, for intervenor. (submitted on the brief in No. 71-1244)
 Before McGOWAN and TAMM, Circuit Judges, and A. SHERMAN CHRISTENSEN,* U. S. Senior District Judge for the District of Utah.
 McGOWAN, Circuit Judge:
 
 
 1
 These two petitions to review rate orders of the Washington Metropolitan Area Transit Commission present essentially the same contentions. These are, in principal part, two in number. One is that the Commission either could not or should not have allowed WMA Transit Company, a common carrier by bus certificated to serve regular routes within and between the District of Columbia and adjoining areas of Maryland, any fare increase whatsoever with respect to its intra-District service. The other is that the allowance of such a fare larger than that charged by D.C. Transit Company in the same area constitutes an invalid discrimination. Neither position is, in our view, sustainable; and we leave the orders under review undisturbed.
 
 
 2
 * The fare increases sought by WMA on November 3, 1970, related to all aspects of its service-intra-District, intra-Maryland, and interstate between the two. Several days of hearings were held (including two informal evening sessions in the service area itself for the convenience of the public) in December and January. Petitioners did not formally participate in those hearings. Indeed, only one individual protestant appeared; and the burden of the challenge to the WMA proposals was carried by the Commission's staff. The intra-District proposals by WMA were that the fare be raised from 35cents to 50cents, and that the free transfers permitted between WMA and D.C. Transit be terminated. The Commission's final action in this regard was to allow a 45cents fare, and to continue in effect the free transfers.
 
 
 3
 The Commission found, after making a number of adjustments to the expense and revenue assumptions of WMA, that during calendar 1971 WMA would, under its existing fares, lose $91,280 before interest costs of $178,733. WMA's proposed fare structure would, after interest, bring an equity return of $66,209. The Commission, following the principle of maintaining the proportionate share of the total revenues which each class of riders had been contributing, and which would result in an estimated 7% loss in business as contrasted with the 13% expected under WMA's proposal, developed and approved a fare structure under which it estimated that WMA would have net operating income of $202,496, representing 5.01% of total operating revenues and bringing an after-interest return on equity of $23,763-a figure equivalent only to less than six-tenths of one per cent of gross operating revenues. The Commission explicitly recognized that this return, which it characterized as "somewhat low," would not assure financial stability because of WMA's inadequate cash flow, but it said, as set forth in the margin, that WMA would have to find new sources of capital funding independent of the users of its service.[1]
 
 
 4
 WMA is not before us complaining of its treatment, but only as an intervenor in support of the orders under review. Petitioner in No. 71-1391 is a resident of the District of Columbia who, at the time this case was taken under submission, was Chairman of the District of Columbia Council and who acted in his official capacity in seeking reconsideration by the Commission of its initial order allowing the 10cents increase in the intra-District fare. Petitioners in No. 71-1244 are a non-profit corporation and its president. The purpose of the corporation is to further the interests of the residents of far Southeast Washington, and for many of its members WMA provides the only public transportation to and from downtown Washington.[2]
 
 II
 
 5
 The conventional nature of the rate-making powers vested in the Commission, and of the standards to be observed by it in exercising them, has been noted heretofore by this court.[3] D.C. Transit System v. WMATC, 121 U.S.App.D.C. 375, 399-402, 350 F.2d 753, 777-780 (1965). We there said, in particular, that "[a] 'just and reasonable' rate is one that assures that all the enterprise's legitimate expenses will be met, and that enables it to cover interest on its debt, pay dividends sufficient to continue to attract investors, and retain a sufficient surplus to permit it to finance down payments on new equipment and generally to provide both the form and substance of financial strength and stability." 350 F.2d at 778. What is perhaps unconventional about the Commission's exercise of its powers in this instance is that the rate as fixed by it confessedly does not enable WMA to attract the capital it needs nor to achieve a condition of financial stability.
 
 
 6
 The first major contention of petitioners takes its point of departure from this novel circumstance. It is argued that WMA is a hopeless enterprise, at least as measured against the premises of private ownership; and that it has no future except one of a vicious spiral of rising fares, declining ridership, and inevitably deteriorating service. For this reason, so it is said, the Commission should flatly deny any and all rate increases sought by it, thereby certainly and surely precipitating a community crisis in transportation which will require the Congress to intervene with substantial subsidies or, what amounts to the same thing, to effect a conversion to public ownership. Since the Commission has refused to take this drastic step, we are now asked to do so.
 
 
 7
 It may, of course, very well be true that petitioners' pessimistic view of WMA's present and future prospects is warranted by the facts. Privately owned carriers of passengers-and, indeed, publicly owned as well-are in dire trouble, particularly in high cost urban areas. The debilitating merry-go-round of higher costs, higher rates, and declining use, is widely evident. It presumably will continue to be so until the nation makes up its mind to adopt a transportation policy which rationally and realistically accommodates the unrestricted use of the private motor vehicle to the economics of mass transportation. The question presently before us is whether the Commission, or this court, can properly follow the path pressed upon us by petitioners. We think not.
 
 
 8
 The regulated carrier is not before us attacking the failure of the Commission to give it the higher fare requested. It purports to be ready to live with the prospect of no significant return upon equity, with all that that implies in terms of the difficulties of attracting new capital. Under such circumstances it has in effect ceased to be a private business, as that concept is ordinarily understood. Its property remains devoted to the public use, but without compensation for that use. And that property will continue to be so devoted unless and until WMA seeks to abandon its service-something which, unlike an unregulated private business, it can do only with the prior approval of the Commission. Since there is an obviously very real need for its service, particularly by those who are not even one-car families, much less two or three, it seems unlikely that such authority will either be sought or be given.
 
 
 9
 WMA's present posture essentially is that it stands ready to continue providing the service on what for all practical purposes is a nonprofit basis, but that continuing the service means that it must at least have enough coming in to pay its current bills. That is what the Commission has given it, and virtually no more. Under normal rate-making theory developed by reference to due process concepts, WMA might conceivably have a serious legal issue to advance. Since it has not done so, we are confronted only with a contention by others that the Commission should not even enable it to continue operating.
 
 
 10
 As legal authority for this extraordinary proposition, petitioners cite only Market Street Railway Co. v. Railroad Commission of California, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). That was a case, however, in which the regulated carrier was contesting the rate allowed it by the regulatory body; and, as the Supreme Court remarked, the appeal before it "raises constitutional issues only." Because of the difficulties which the enterprise had experienced, the California Commission allowed it a 6 per cent return on the current market value of the property used and useful in the transportation service.[4] The carrier argued that to use this rate base, as distinct from reproduction cost, book values, the face value of outstanding securities, or some combination of these, would be unconstitutional. The Supreme Court upheld the regulatory decision as against this challenge, saying in substance that the Constitution does not guarantee in all circumstances a profit to a privately owned business subject to public regulation, and that, for reasons beyond regulatory control such as the competition of both municipal transit and the private automobile, the property values claimed by the carrier had already disappeared.
 
 
 11
 Unlike the regulated utility in Market Street Railway, WMA is not contending for a higher rate-a position, which, in the present context, is tantamount to foregoing a right to try to earn a profit from the properties it has dedicated to the public use. If it is prepared to continue to provide on these terms the service so badly needed by a significant part of this community, the Commission's enabling it to do so by fixing a fare which roughly matches income with outgo constitutes no abuse of the powers vested in the Commission warranting our intervention.[5]
 
 III
 
 12
 The Interstate Compact creating the regulatory powers of the Commission contains a provision-couched in language traditionally used in statutes of this kind-with respect to unduly preferential or discriminatory rates.[6] This provision is invoked by the petitioners because the 45cents intra-District rate permitted WMA by the Commission is higher than the 40cents rate currently charged by a competing carrier, D.C. Transit, serving the same area.
 
 
 13
 The Commission's response to this claim was to characterize the regulatory language as addressed solely to the carrier whose rates are in issue, in the sense that it must not discriminate between the persons who use its services. The Commission pointed out that a contrary construction would mean that the Commission would be handicapped in working out a fare structure for the single carrier which would not be unduly preferential or discriminatory as between different classes of users of that company's services or different geographic sections of its service area. The competition which D.C. Transit offers to WMA is only over a portion of the latter's routes. If the competing carrier's current rate imposes a ceiling on what WMA can charge for a particular service, then there is created the danger that riders in other service areas of WMA will bear an unduly high proportion of the cost of providing its entire service.
 
 
 14
 We think the Commission's interpretation of the statutory language is the correct one. This language is not unique to the statutory scheme of regulation here involved, and there is no indication that the Congress intended to give this language the meaning which petitioners claim for it. Indeed, for it to have done so would have made the regulatory system set up by it essentially unworkable.
 
 
 15
 It is by no means remarkable that two regulated companies competing in the same service area may have different rates. This has been true in the past as between WMA and D.C. Transit. As the Commission found in its Order No. 1130, since April 14, 1963 the fares of the two companies have been the same only for a single period of six months, and the WMA fare has varied from time to time, being either higher or lower than that of D.C. Transit. The two companies have quite dissimilar operating characteristics, mainly centering around the discrepancy in their respective sizes. The bus fleet of D.C. Transit is ten times that of WMA, as are also its gross revenues. They have different unions and different wage scales. D.C. Transit is mainly urban in its operations, whereas only twenty-five per cent of WMA's service is intra-District. To try to regulate either by reference solely to the current fares of the other would, as the Commission has said, invite the very kind of unduly preferential or unduly discriminatory rates which the Compact forbids.[7]
 
 
 16
 It may seem anomalous to the residents of the area that these differentials exist, but they are an inevitable product of the legislative policy decision to leave mass transportation in this area in the hands of privately owned carriers. So long as such carriers are subject to regulation, and the Constitution protects them in the conditions of their dedication of their property to the public use, fare structures must be designed to meet the needs of each one without discrimination among the people who are respectively using each one. Under these circumstances, differing rates, even though charged for the same service, may result, but that alone does not make the higher rate unduly discriminatory within the meaning of the regulatory charter.
 
 
 17
 The petitions for review in Nos. 71-1244 and 71-1391 are denied, and the orders of the Commission under review are left undisturbed. The escrow fund heretofore created pendente lite by order of this court is terminated, and the balance therein released forthwith to WMA.
 
 
 18
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1970)
 
 
 [1]
 While we do not believe that this amount of return will provide the company with the means to achieve financial stability, it is clear to us that a return to equity of two or three times this amount would not achieve that result. The crux of this company's stability problem lies in the lack of adequate cash flow, a difficulty that we cannot, legally or philosophically, remedy by charging higher fares. In the fares we are establishing today, the ratepayer is making his full contribution for the service provided and, if, because of accrued debt or deferred maintenance or whatever reason, the company needs funding beyond that, the company will have to look to a source other than the ratepayer
 
 
 [2]
 The Commission's Order No. 1127 of March 24, 1971 approved the challenged fare. The petition for reconsideration of Southeast Neighbors, Inc., was denied by the Commission's Order No. 1128 of March 30, 1971, with a fuller statement of its reasons for doing so in Order No. 1130 of April 2, 1971. The petition for reconsideration of petitioner Hahn was denied by the Commission's Order No. 1132 of April 20, 1971
 This court denied a stay on April 30, 1971, but directed WMA to deposit the difference between the 35 and 45 per cent rates in an escrow fund pending the determination of the merits of the review proceeding. There is presently pending a motion by WMA, filed May 19, 1972, for release of the escrow fund. Only the petitioners in No. 71-1244 have responded to that motion, their position being that, subject to certain accounting arrangements, they do not object to the immediate release of one-half of the fund.
 
 
 [3]
 The rate level standards to be observed by the Commission in rate-making are contained in the following paragraphs of Section 6 of Article XII of the Interstate Compact creating the Commission, 1 D.C.Code Sec. 1410:
 (3) In the exercise of its power to prescribe just and reasonable fares and regulations and practices relating thereto, the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenue sufficient to enable such carriers, under honest, economical, and efficient management, to provide such service.
 (4) It is hereby declared as a matter of legislative policy that in order to assure the Metropolitan District of an adequate transportation system operating as private enterprises the carriers therein, in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the carriers attractive investments to private investors. As an incident thereto, the opportunity to earn a return of at least 6 1/2 per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on gross operating revenues, shall not be considered unreasonable.
 
 
 [4]
 The figure used by the California Commission was the amount for which the carrier had recently offered to sell its properties to the only potential buyer-the City of San Francisco. That value was, of course, far below either book or replacement cost, or the face amount of outstanding capital stock and debt obligations
 It is perhaps instructive to note, as did the Supreme Court, that sale to the City was effected before the litigation ended in the Supreme Court. Natives and visitors alike now enjoy the picturesque charm of the cable cars at the expense, to the extent that costs exceed revenues, of all the taxpayers.
 
 
 [5]
 With respect to the reasonableness of the 45cents intra-District fare, it is not clear that petitioners in No. 71-1244 are persisting in their opposition. In their response, filed May 19, 1972, to the motion of WMA to release the escrow fund, they expressed willingness to consent to the immediate release of half of the escrow fund since, as they put it, the "burden of our argument on the case now on appeal is that the rates were discriminatory in relation to the 40cents rate of D.C. Transit."
 In any event, we have considered with care all the objections raised in both No. 71-1244 and No. 71-1391 with respect to the reasonableness, as distinct from the alleged discriminatory defect, of the 45cents fare. We find no basis for invalidating the Commission's allowance of this fare on any of these other grounds. They consist mainly of claims that the Commission (1) did not take sufficient account of the impact of the new rate on the volume of traffic inasmuch as it underestimated the resistance factor, and (2) failed to give sufficient weight to evidence which, in the petitioners' view, showed that WMA was not under economical and efficient management.
 In the case of the former, the Commission was guided by substantial upward adjustments which the staff made in the resistance factor estimates put forth by WMA in support of its application; and we are in no position to say from this record that those increased estimates were still too much on the optimistic side. As to the management factor, there is no claim that WMA was dishonest, or that it was improvident in its dividend distributions since it has not been paying any. The allegations under this head relate mainly to allegedly excessive insurance costs by reason of a bad safety record. The Commission did, however, take affirmative steps in its order to bring about improvement in this area.
 
 
 [6]
 Section 6(a) (2) of Article XII of the Compact provides as follows:
 If, after hearing held upon reasonable notice, the Commission finds that any fare, regulation or practice relating thereto, . . . is unjust, unreasonable, or unduly preferential or unduly discriminatory either between riders or sections of the Metropolitan District, it shall issue an order prescribing the lawful fare, regulation, or practice to be in effect.
 
 
 [7]
 There is some evidence in the record that the service furnished intra-District riders by WMA is superior to that of D.C. Transit in that the former furnishes a 19 per cent faster running time. The Commission, although noting this fact, did not rest its disallowance of the claim of discrimination upon it, nor do we. It is not claimed on this appeal that the intra-District riders of WMA are bearing a disproportionate share of the total cost of the services provided by WMA. The fact appears to be that there is only a minimal change in the percentage share of the total revenues of WMA contributed by intra-District riders under the 45cents fare