**SOUTH CAROLINA GENERATING COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION** and Georgia Public Service Commission, Respondents.

**SOUTH CAROLINA PUBLIC SERVICE COMMISSION, Petitioner,**

v.

**FEDERAL POWER COMMISSION** and Georgia Public Service Commission, Respondents.

Nos. 7391, 7393.

United States Court of Appeals Fourth Circuit.

Argued June 14, 1957.

Decided Oct. 23, 1957.

T. Justin Moore, Richmond, Va., and David W. Robinson, Columbia, S. C. (W. C. McLain, Arthur M. Williams, Jr., Columbia, S. C., George D. Gibson, John W. Riely, Richmond, Va., Robinson, McFadden & Dreher, Columbia, S. C., and Hunton, Williams, Gay, Moore & Powell, Richmond, Va., on brief), for petitioner S. C. Generating Co.

Irvine F. Belser, Asst. Atty. Gen. of South Carolina (T. C. Callison, Atty. Gen. of South Carolina, on brief), for petitioner S. C. Public Service Commission.

William H. Schroder, Atlanta, Ga., and William C. Chanler, New York City (Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., and Winthrop, Stimson, Putnam & Roberts, New York City, on brief), for respondent Georgia Power Co., movant for intervention.

Theodore French, Atty., Federal Power Commission, Washington, D. C. (Willard W. Gatchell, Gen. Counsel, and Howard E. Wahrenbrock, Solicitor, Federal Power Commission, Washington, D.

C., on brief), for respondent Federal Power Commission in both cases.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOPER, Circuit Judge.

South Carolina Generating Company and the South Carolina Public Service Commission filed these petitions for review of an order of the Federal Power Commission reducing rates on the wholesale purchase of electric energy established in a long-term contract negotiated at arm's length in interstate commerce between the Generating Company, the selling utility, and the Georgia Power Company, the purchasing utility.

The Generating Company is a South Carolina corporation formed to construct and operate a steam electric generating station known as Plant Urquhart, located near North Augusta, South Carolina, on the Savannah River. The Urquhart plant as originally built had a rated capacity of 150,000 KW made up of two 75,000 KW generators. The entire capital stock of the Generating Company is owned by the South Carolina Electric and Gas Company (E & G), a South Carolina electric utility, which distributes and sells electric energy in a large area of South Carolina. Georgia Power Company (Georgia Company), an intervenor here, generates and distributes energy throughout the State of Georgia. The South Carolina Public Service Commission is charged with general utility regulation within South Carolina; its counterpart in Georgia is the Georgia Public Service Commission, a respondent in both cases.

E & G, in common with most other utilities in the electric power industry, experienced a substantial increase in business during the post-war years, and during this period had frequently been confronted with the necessity of adding to its generating capacity. In the summer of 1950, plans were being studied for the purpose of locating additional facilities for E & G in its service area in the western central portion of the state, special consideration being given to a site near Brancheville, South Carolina, and certain plant equipment was on order for delivery in August, 1952. Before final plans were completed and a definite site chosen, the Atomic Energy Commission announced that the Savannah River Hydrogen Bomb Project would be located about fifty miles west of the Brancheville site under consideration. The location of the project in E & G's service area would be of substantial economic benefit to the utility, since the Project would require large quantities of dependable energy and would bring with it additional commercial and residential consumers. Accordingly, E & G advised E. I. du Pont de Nemours and Company, prime contractor for the A.E.C., that it was prepared to construct additional facilities in the area of the proposed Project which could supply the A.E.C.'s power requirements. The initial rates proposed by E & G during negotiation were rejected by du Pont as excessive. Lower rates, however, would have been impossible under conventional utility financing, since E & G's mortgage, like most utility mortgages, restricted bonded indebtedness to 60 per cent of the total of any property additions. Money to finance the proposed power facilities was needed at a low cost in order to make possible the low rates required by du Pont. To overcome this obstacle, the Generating Company was formed by E & G for the purpose of financing construction of the steam generating station at Urquhart, which could supply the required capacity to A.E.C. The new corporation was financed on a debt ratio of 90 per cent—75 per cent in mortgage bonds, 15 per cent in ten-year notes, and the remaining 10 per cent in common stock which was purchased by E & G. This high debt financing provided money at a low cost and made possible lower rates to A.E.C., and consequently, du Pont agreed to accept a capacity of 30,000 KW from one of the generating units to be constructed at the new plant. The financing of the Generating Company was made possible

by certain commitments and guarantees of E & G hereinafter more fully described.

The Georgia Company at about the same time was also in need of additional power and was contemplating the construction of a one unit steam station near Augusta, Georgia, on the Savannah River across from the Urquhart site. Officials of E & G notified the Georgia Company of their plans to build the two unit 150,000 KW capacity at Urquhart, financed through the Generating Company. Both utilities instituted independent cost studies to determine whether the cost of purchasing the required capacity for the Augusta area from the Generating Company would result in savings to the Georgia Company over the costs entailed in constructing their own facilities to supply the additional capacity. Thereupon, on November 19, 1951, after some negotiation, a long-term contract for the sale of the capacity of one of the 75,000 KW units to be built at the Urquhart plant was entered into between the Georgia Company and the Generating Company. On the same day, E & G contracted to purchase the remainder of the capacity of the other unit not required by the A.E. C., amounting to 45,000 KW. Nearly a year and a half later, on March 9, 1954, after the Urquhart plant was put into operation, du Pont executed a contract with the Generating Company for the purchase of 30,000 KW to which E & G was made a party.

The Georgia Power contract, the one in issue here, is for a period of twenty-five years, and provides for a two-part rate consisting of an energy charge and a capacity charge. The energy charge, which is not in dispute, is based upon fuel and maintenance costs plus taxes not related to income and is established initially in the contract at the rate of $.00315 per KWH. The capacity charge, computed on a KW basis, is divided into three components. The first is a finance component designed to provide interest and amortization of the 90 per cent debt n twenty-five years and an 8 per cent return on equity, and results in a figure of $10.50 per KW per annum. The second is an operations component including operating, administrative, and general expenses not included in the energy charge, which amounts to $4.80 per KW per annum. The total of these components constitutes the basic capacity charge of $15.30 per KW per annum. To this basic capacity charge is added the third component, a fixed charge of $7.20 per KW per annum, which does not relate to any costs on the books of the Generating Company but was designed to divide equally between the Generating Company and the Georgia Company the savings accruing. to the Georgia Company from the agreement as compared with the costs of construction and operation of a generating station of its own. Thus, the contract provides for a total capacity of $22.50 per KW per annum.

The net savings to the Georgia Company as a result of this contract were estimated at $5.38 per KW per annum in capacity costs, or a total of $403,500.00 per annum. Annual savings in respect of the fuel or maintenance were estimated at between $175,000.00 and $200,000.00. Thus total savings to the Georgia Company through the purchase of its requirements from the Generating Company amounts to approximately $600,000.00 each year.

Among the other provisions of the contract is an article which subjects the capacity charge to an escalation formula for variations between the estimated and the actual investment and between the estimated and the actual expenses and taxes. Similar provisions are made in regard to the energy charge. In addition, a "recapture clause" provides that upon twelve months' notice the Generating Company may reduce the total contract capacity of the Georgia Company by 25,000 KW, and on thirty months' notice it may terminate the agreement and recapture the entire contract capacity. In the event of an outage of one of the two units at Plant Urquhart, the Georgia Company is guaranteed by the

contract one-half of the capacity of the remaining unit (37,500 KW).

The du Pont contract, like the Georgia Company contract, provides for a basic capacity charge of $15.30 per KW per annum, but contains an additional fixed charge of only $3.70 per KW, resulting in a total capacity rate of $19.00 per KW per annum. The contract with the parent company, E & G, provides for a total rate of $15.30 per KW per annum with no additional fixed charge. Both contracts have escalation provisions similar to that contained in the Georgia Company contract, but neither the du Pont nor the E & G contract contains a "recapture" provision. To secure the power requirements of the A.E.C. the parent company, E & G, was made a party to the du Pont contract, along with the Generating Company, and gave certain performance guarantees to du Pont. It was necessary for E & G to make improvements on its transmission system to insure high quality service. In addition, A.E.C.'s requirements of 30,000 KW are guaranteed by E & G in the event of an outage of one or both of the units at Plant Urquhart, except in a situation where an outage of both units occurs through a force majeure.

The Georgia Power contract, the only one of the three within the jurisdiction of the Federal Power Commission, was filed with the Commission and accepted for filing on October 1, 1953. On October 29, 1954, an order was issued by the Commission initiating a proceeding whereby the Generating Company was required to make a showing of facts necessary for the Commission to determine whether or not the rates agreed upon with the Georgia Company were just, reasonable and non-discriminatory. A hearing was held and testimony was taken. In addition to the testimony of expert witnesses supporting the fairness of the contract on behalf of the Generating Company, officials of the Generating Company, E & G, and the Georgia Company testified as to the advantages of the contract to both contracting parties. Two witnesses testi-

fied on behalf of the Federal Power Commission. Representatives of the South Carolina Public Service Commission entered an appearance expressing approval of the contract, while a representative of the Georgia Public Service Commission took the position before the Commission that the contract was discriminatory and unfair. The Presiding Examiner, in a written report, upheld the contract as not unjust, unreasonable or discriminatory. The Commission staff filed exceptions to the examiner's report and oral argument was heard. The Commission, one Commissioner dissenting, set aside the findings of the Presiding Examiner, taking the view that the contract rate would provide revenues to the Generating Company in excess of the cost of service, including a fair return upon the amount prudently invested. Accordingly, the Commission made the finding that the contract rate for service to Georgia Power was in excess of a just and reasonable rate and was unjust and unreasonable, and reduced the rate from $22.50 per KW per annum to $21.948 per KW per annum, and also nullified the escalation provision as applied to the capacity charge.

The principal attack upon the order of the Commission is directed against its power to set aside the rate fixed by the contract between the utilities and to impose a new rate based upon the cost of service designed to produce a fair return upon the amount prudently invested. It is pointed out that the contract between the Generating Company and the Georgia Power was negotiated at arm's length and was advantageous to both parties. It enabled the corporate system, composed of E & G and the Generating Company, to secure a needed source of additional power and to sell at wholesale a portion of the product at substantial profit, and to use the remainder to supply its consumers in South Carolina at reasonable terms. At the same time, the arrangement furnished Georgia Power a dependable source of energy at a cost much less than would have been incurred by build-

ing an additional plant, so that its retail consumers in Georgia were also benefited. Hence it is said that the Commission was obliged to approve the contract and had no power under the Federal Power Act, 16 U.S.C.A. § 791a et seq. to substitute a lower rate based upon the cost of service, even though it would produce a reasonable return upon the amount invested.

The contention is based upon the companion decisions of the Supreme Court in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed.2d 373, and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388, in both of which the Court set aside an order of the Federal Power Commission raising the rate for supplying energy prescribed in a contract between the utilities. In the Mobile case the question arose under §§ 4(c), (d) and (e) and § 5(a) of the Natural Gas Act, 15 U.S.C.A. § 717 et seq., which gives the Federal Power Commission supervision of the rates of natural gas companies. The case involved a long-term contract between a natural gas pipe line company and a distributing company. The contract fixed a substantially lower rate for gas to be supplied to a particular consumer than was charged for other gas. The purpose was to induce a manufacturer of cement to build a plant in Mobile. Subsequently the pipe line company, without the consent of the distributing company, filed new schedules more closely approximating the rates charged for the gas furnished to other consumers and the new schedules were put into effect with the consent of the Commission. This action was disapproved by the Supreme Court, which held that the Natural Gas Act did not give natural gas companies the right to change their contracts unilaterally, and that the Commission had no power to modify the contract rate unless it should find it would be "unjust, unreasonable, unduly discriminatory or preferential" [350 U.S. 348, 76 S.Ct. 369] under § 5(a) of the statute.

The Sierra case arose under §§ 205 (c), (d) and (e) and § 206(a) of the Federal Power Act, which are substantially similar to the corresponding sections of the Natural Gas Act. There was involved a contract for the supply of electric power by a producer to a distributor at a special low rate which was fixed to forestall competition from another source. Later, when power from this other source was no longer available, the producer filed a new rate with the Commission increasing the cost to the distributor by 28 per cent and the Commission approved the new rate after finding upon investigation that it was not unjust, unreasonable, unduly discriminatory or preferential. Assuming that this finding was equivalent to a finding that the contract rate was unreasonable, the Supreme Court nevertheless set aside the order of the Commission, since it did not appear that the old rate was so low as to affect adversely the public interest.

■ From the discussion in the Mobile case we learn that the Commission is not empowered by the Natural Gas Act to fix the rates initially. Under the statutory scheme all rates are established initially by the utilities, by contract or otherwise, and all rates are subject to modification by the Commission upon a finding that they are unlawful. The basic duty is imposed on the utility by §§ 4(c) and (d) of the Gas Act (and by §§ 205(c) and 205(d) of the Power Act) of filing with the Commission rate schedules and contracts in force and all changes in such schedules. This scheme differs from that prescribed by the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., under which all rates to shippers must be uniform and no provision for individual contracts is made. The basic powers conferred upon the Commission by §§ 4(e) and 5(a) of the Gas Act (and §§ 205(e) and 206(a) of the Power Act) are to review the rates and contracts made in the first instance by the utilities and, if they are found to be unlawful, to determine a just and reasonable rate to be thereafter observed.

It was held that this procedure precludes a producer from changing contracts unilaterally to serve its own private interest, but affords an avenue of relief when the interest of the producer coincides with the public interest. In such case the utility has the right to complain and ask the Commission to investigate the rate, and if it finds after hearing that the contract rate is so low as to conflict with the public interest, it has authority to increase the rate.

In the Sierra case, the Commission made a similar ruling for the same reason and, in addition, it made a ruling by which the utilities in the pending case set great store. The Court pointed out again that the Commission has undoubted power to change a contract rate and to prescribe a new rate to be thereafter observed if it determines the old rate to be unlawful, but the Court added that a contract rate is not invalid solely because it yields less than a fair return on invested capital. The Court said, 350 U.S. at page 355, 76 S.Ct. at page 372:

"* * * while it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. Cf. Arkansas Natural Gas Co. v. Arkansas Railroad Comm., 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705. In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. That the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in § 201 of the Act that the scheme of regulation imposed 'is necessary in the public interest'. When § 206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either 'unjust' or 'unreasonable' simply because it is unprofitable to the public utility."

It is now contended that these rulings demonstrate that the Commission had no power to set aside the agreed rate and to impose a new rate based on the cost of service in accordance with the orthodox methods of rate making in utility cases. It is argued very strongly that the contract was beneficial to the South Carolina area, since it furnished the E & G system with an adequate supply of energy under advantageous terms and thus enabled it to serve its South Carolina consumers at a reasonable cost, and also was beneficial to the Georgia area, since it furnished the Georgia Power Company with energy at a cost below that which a plant of its own would have entailed and enabled it to serve its retail consumers at a reasonable cost. Hence it is said that the contract did not adversely affect the public interest.

The argument seems to have great logical force but on examination it soon appears to be an attempt to generalize from a particular situation without recognizing the significant difference in the facts in the pending case. The Supreme Court was dealing with rates, too low to permit an adequate return according to accepted standards, which had been adopted to serve the interest of the producing utilities—in the Sierra case for the purpose of cutting off competition—but the public interest was served by the lower cost to the ultimate consumers. The practical effect of the decision is to compel contracting utilities to abide by their agreements unless it is shown that the agreed rate is so low "as to * * * impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." These quoted clauses form the

cornerstone of the utilities argument, but it is plain that they are directed to rates too *low* to be ordinarily imposed.

■ In the pending case, to the contrary, we are dealing with a rate that was too high according to accepted standards of rate regulations. When the rate was filed the Commission had the power under § 205(e) of the statute to enter upon a hearing on its own initiative concerning the lawfulness of the rate; and in doing so it obviously acted within the scope of its authority. Consequently, the primary question before us is not whether the Commission had the power to act but whether its finding that the contract rate was unreasonable was supported by substantial evidence on the whole record. See the review provisions of the Federal Power Act, 16 U.S.C.A. § 825*l*(b), and the related provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1009. The case before us comes down to the inquiry whether the utilities were justified in retaining for themselves the savings inherent in a situation which developed in 1950 and led to the organization of the Generating Company. At that time the pressing need for more power, felt by E & G, the Georgia Power Company, and the Atomic Energy Commission, culminated in an arrangement which was beneficial to all concerned. Undoubtedly the successful solution was due in large measure to the experience and enterprise of the interested parties, but it does not follow that they were entitled to all of the savings which actually flowed from the natural growth and economic development of the area. The problem presented to the Commission was not substantially different from that which usually arises when a public utility, by the force of circumstances a natural monopoly, seeks to furnish a commodity to the general public; the reasonableness of its proposed rate must be considered, and the answer is found by allowing a reasonable return upon the investment.

We do not think that the Supreme Court denounced this accustomed procedure in the Mobile and Sierra cases when it concluded that the unusually low rates which the utilities had voluntarily set up to serve their own interests were not unjust or unreasonable; and hence the Commission in the pending case, bearing in mind that its duty is to protect the public interest as distinguished from the private interest of the utilities, and finding that the contract rate is unreasonably high was justified in fixing a lower rate for the benefit of the retail consumers in Georgia after providing a reasonable return on the moneys invested by the utilities.

■ It is objected that the reduction of rates may not benefit the Georgia consumers since it may lead the E & G system to exercise the option granted it by the contract on twelve months' notice to reduce the contract demand of Georgia Power by 25,800 KW and on thirty months' notice to terminate the agreement and recapture the entire capacity. There is, however, no indication at present that such a step is contemplated and if an attempt should be made in the future, notice of the change would necessarily be filed with the Commission which would then have the opportunity to consider what should be done under the changed situation. In the meantime, its present order will be effective. See Pennsylvania Water & Power Co. v. F. P. C., 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042.

■ It is also suggested by the South Carolina Public Service Commission that the Federal Power Commission had no authority to alter the terms of the contract, since the State Commission has approved the creation of the Generating Company and the contracts under which it serves the South Carolina consumers. It is obvious, however, that the State Commission is without power to control the decisions of the Federal Power Commission when it is acting within the scope of its authority in a matter involving interstate commerce. P. U. C. of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294,

71 L.Ed. 549; U. S. v. Public Utilities Commission, 345 U.S. 295, 303, 304.

■ We come then to consider the specific objections to the conclusions of the Federal Power Commission in the exercise of its power under Sec. 206(a) of the statute to determine the just and reasonable rate to be observed after finding that the contract rate was unreasonable. First, the Generating Company objects to the Commission's action in determining the amount of Federal income taxes that should be included in the cost of service. The Commission made allowance only for the taxes paid by the Generating Company as a separate corporate entity, and rejected the contention that the allowance should be computed with reference to the system as a whole, since in practical effect the Generating Company is merely a department of a single enterprise for which E & G, the parent company, has furnished the credit and financial backing. The amount of the tax of the Generating Company considered as a separate corporate entity is substantially less than that borne by the system as a whole, according to the computations of the utility. Under the Commission's method the Federal income taxes are $217,434.00 and the State income taxes are $43,854.00, or a total of $261,288.00. If the taxes are calculated on the system as a whole, the Federal income taxes amount to $398,002.00 and the State income taxes to $53,377.00, or a total of $450,379.00.

A striking difference in the debt ratios in the capitalization of the parent and subsidiary companies brings about this result. The Generating Company was purposely capitalized with a 90 per cent debt ratio in order to cut down the costs of financing the enterprise and make possible the sale of electric energy to consumers at a lower price. Accordingly, interest payments on the debt, which are deductible in computing taxable income, are relatively large. On the other hand, the income tax of E & G is relatively high, because it is obliged to maintain a low debt ratio and a high common equity ratio in order to protect its financial standing and secure a favorable market for the system's securities; and the need for a high ratio of common equity as compared with the debt, became greater when the Generating Company was formed. The result was that in 1954, after the new plant had been built, the system capitalization ratio consisted of 62.8 per cent debt, 9.4 per cent preferred stock, and 27.8 per cent common equity, so that the interest payments of the system as a whole are comparatively small and the income tax comparatively high. The testimony of financial experts on behalf of the company shows that the figures last quoted represent a substantial increase in the common equity over that of the parent company in 1951, before the subsidiary was organized. In order to finance the new company, it was necessary for the parent company to provide funds for investment in the common stock of the subsidiary and also to provide a proportionately larger amount of its new money requirements by the sale of equity securities. In short, it was necessary for the parent company to provide equity leverage for the debt of its subsidiary. The essential part which the parent company played in the organization of the new enterprise is also shown by the various commitments which it made in guaranteeing the payment for equipment as well as payment of the bonds and notes of the subsidiary and, to some extent, the performance of its contracts. For these reasons the utilities contend that the Commission's determination of the amount of revenues that should be allowed to the Generating Company on account of income tax expense should be increased by the sum of $189,091.00.

The Commission takes the position that it should follow its usual rule that the allowance for taxes should not exceed the taxes actually paid, since otherwise the Generating Company would enjoy benefits of high debt financing and the Georgia consumers would assume fictitious costs. The evidence in the case, however, tends to show that the additional costs for which the utility con-

tends are not fictitious but are actually incurred by the system as a whole. Moreover, the action of the Commission seems to be inconsistent with its conclusion that, in fixing the rate of return on the investment of the utility, the capitalization of the system as a whole should be used. In its conclusion on this point, the Commission said:

"Applying the rates found reasonable for debt, preferred stock, and common equity, and using the system capitalization ratio of 62.8%–9.4%–27.8%, we arrive at an allowance for over-all rate of return of 5.55%."

The Commission does not explain in its opinion why the technical distinction between the two corporate entities is observed in determining the allowance for income taxes, while for the purposes of fixing the rate of return on the investment the system is considered as a single enterprise.

■ The apparent inconsistency may be reconciled, or justified, by reasons that do not occur to us. No reasons are advanced in the Commission's opinion, if in fact reasons exist. In these circumstances, in deference to the Commission's primary function, we are reluctant to draw an inference of arbitrariness without affording an opportunity for further explanation. On the other hand, a reviewing court cannot perform its proper function when the regulatory body has failed to make adequate exposition of the grounds for its action. We realize the limits upon the scope of judicial review of rate orders, as taught in Hope Natural Gas Co. v. Federal Power Commission, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. But in a later case, Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 634, 65 S.Ct. 850, 854, 89 L.Ed. 1235, the Supreme Court set aside an order of the Federal Power Commission, and speaking through Mr. Justice Douglas, as it had done in the Hope case, said: "We have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest. * * * Their absence can only clog the administrative function and add to the delays in ratemaking." The same section of the Administrative Procedure Act (Sec. 8(b), 5 U.S.C.A. § 1007(b)), which calls for findings of fact, requires with equal force "a statement of * * * the *reasons* or basis therefor, upon all the material issues of fact, law, or *discretion* presented on the record." [Emphasis added.] This case must therefore be remanded for a fuller explanation as to the different treatments of capitalization ratio and allowance for income taxes.

■ The Generating Company makes the additional contention that the rate of return should be 6 per cent and not 5.55 per cent as allowed by the Commission. The difference in money return on the amount of the investment found by the Commission approximates $57,000.00 per annum. For its position the Generating Company relies primarily on the testimony of an experienced investment banker familiar with the financial background of the E & G system and the marketing of utility securities. He was of the opinion that 6 per cent was necessary to assure the successful financing of the system in the near future, basing his opinion in large measure on a theoretical capitalization ratio of 50 per cent debt, 15 per cent preferred stock, and 35 per cent common equity which he considered the setup that the company should ultimately maintain.

The Commission, on the other hand, based its determination on the cost of capital, using the actual capitalization ratios of the system. Testimony as to the cost of the debt and of the preferred stock given by an expert witness was accepted by the Commission and his estimate of the cost of the equity capital was raised from 7.9 per cent to 10.5 per cent so as to take into account the relative thinness of the equity capital, the upper trend of the money market, and other conditions.

The company concedes that a cost of capital study is a recognized means of

arriving at a rate of return but it contends that the Commission's conclusions were not supported by the testimony, because its expert witness failed to express an opinion as to what the rate of return should be. It is said that the Commissioners are not financial experts and are therefore not entitled to take the evidence and to draw an expert conclusion therefrom. This position is at variance with a decision of the Supreme Court in Market St. Ry. Co. v. Railroad Commission of California, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171, where the Court held that an order of the Commission fixing a rate of return was not unsupported by the evidence and rendered invalid by the fact that the Commission evaluated the situation without the aid of expert testimony. Under these circumstances the finding of the Commission on this point should not be disturbed.

■ The Generating Company also objects to the finding of the Commission that the automatic escalation clause of the contract, providing for adjustment of the basic capacity charge, is unjust and unreasonable. The clause is designed to increase or decrease the capacity charge in case of variations between the estimated and the actual amount of investment and of expenses of operation of the plant. Similar provisions are made in regard to changes in the energy charge. The Commission retained a provision for automatic escalation of the capacity component in respect to future changes in the rate of Federal income taxes and also retained the escalation provisions in regard to the energy charge. It gave no reason for its action other than to make the general finding that the escalation provisions of the basic capacity charge are unjust and unreasonable and in contravention of § 205 of the statute and § 35.3 of the Commission's regulations. We recognize that the retention or elimination of such a clause is a matter for the determination of the regulatory body upon findings of fact. In the absence of such findings, however, we think the question should be re-examined by the Commission upon the remand of the case.

The amount allowed the utility for interest during construction is also the subject of objection on the part of the Generating Company. The examiner found upon uncontradicted evidence that the equity funds used by the parent company during construction cost approximately 10 per cent. He allowed 8 per cent for the purpose of inclusion in the rate base but the Commission reduced this amount to 6 per cent, which it held was reasonable and consistent with its past practice. The Commission does not make clear why this actual expense, which was involved in the construction of the plant, should not be considered a part of the investment on which a reasonable return should be allowed. In its opinion it declares that the Generating Company should not be permitted to capitalize profits on investment before commercial operation of the plant has begun. This may be true, but it does not explain why an element of cost actually experienced should not be included in the rate base. Accordingly this matter should also be examined on remand so that the Commission may make adequate findings in explanation of its determination.

■ Objection is also made to the Commission's allowance of a 3 per cent annual rate of expense depreciation. The utility offered evidence in support of this rate and the examiner adopted it in his computation. The Commission however reached the conclusion that a 2.75 per cent rate was adequate for this purpose. This conclusion is not without support in the evidence. The 2.75 per cent rate had been used by the E & G company for many years on substantially similar property and was also used by one of the company's witnesses in a study presented to the Commission's staff; but a shift to 3 per cent seems to have been made for the purpose of the hearing. Under these circumstances it can not be said that the determination of the Commission was without substantial basis in the evidence.

The order of the Commission will remain suspended and the case remanded for further proceedings as indicated in this opinion.

PARKER, Chief Judge (concurring in part and dissenting in part).

These are petitions to review an order of the Federal Power Commission reducing rates on electric energy furnished by the South Carolina Generating Company to the Georgia Power Company pursuant to a long term contract which prescribed the rates. There is no question but that the energy was furnished in interstate commerce. The order is attacked on the ground that the Commission was without power to enter the order in the absence of a finding that the contract rates will result in impairing the ability of one of the parties thereto to render public service or will impose an excessive financial burden upon its customers, and upon the further ground that the rates prescribed by the order are not supported by the record before the Commission. I do not think that either ground of attack can be sustained. The facts may be briefly summarized as follows:

The Generating Company is a wholly owned subsidiary of the South Carolina Electric and Gas Company, hereafter referred to as E & G, which is engaged in generating and distributing electric energy in the State of South Carolina, and which in 1950 was contemplating an addition to its generating capacity. About that time the construction of the Hydrogen Bomb Project in South Carolina by E. I. duPont de Nemours and Company was commenced and the Generating Company was organized by E & G to supply the electric energy required by the project, a separate corporation being organized because of the restriction which existed on the amount of E & G's mortgage indebtedness and the necessity of acquiring additional capital for the new construction at a low rate if the energy was to be supplied to duPont at a rate to which duPont would agree. The Generating Company was accordingly financed on a ratio of 90% debt to 10% of common stock, and proceeded to construct at Urquhart on the Savannah River a power plant of 150,000 KW capacity, which was large enough to take care of the needs of E & G and duPont and provide additional energy, which was sold to the Georgia Power Company.

Prior to the construction of the Urquhart plant, the Georgia Power Company, which had been contemplating additions to its own generating system, determined that it could save money by purchasing energy from the Generating Company instead of building an additional plant of its own. It accordingly entered into a twenty-five year contract with the Generating Company by the terms of which that company undertook to furnish and Georgia Power agreed to purchase the full capacity of one of the two 75,000 KW units to be installed by the Generating Company at Urquhart. The 75,000 KW capacity of the other unit was sold to duPont and E & G, 30,000 KW being sold to duPont and 45,000 KW to E & G.

The charge to all three of the customers of the Generating Company, i. e. Georgia Power, duPont and E & G, was divided into an energy charge and a capacity charge. The energy charge is not in dispute. The capacity charge to Georgia Power was $22.50, to duPont $19.00 and to E & G $15.30. The $22.50 capacity charge to Georgia Power embraced an item of $15.30, corresponding to the capacity charge to E & G and an additional item of $7.20. The $15.30 item was and is made up of two components. The first is a finance component designed to provide interest and amortization of the 90% debt in twenty-five years and an 8% return on equity, and results in a figure of $10.50 per KW per annum. The second is an operations component including operating, administrative, and general expenses not included in the energy charge, which amounts to $4.80 per KW per annum. The remaining $7.20 added to the capacity charge in the rate fixed by the contract

with Georgia Power does not relate to any costs on the books of the Generating Company but was designed to divide equally between that company and Georgia Power the estimated savings to Georgia Power from the agreement as compared with the construction and operation of a generating station of its own, the estimated saving being around $600,000 per year. The contract provided for termination on notice, and contained escalation clauses under which both the energy charge and the capacity charge were related to certain costs. Under the escalation clause relating to the capacity charge, that charge to Georgia Power had been increased to $25.11 per KW.

The Commission held that the reasonableness of the rate should be determined by cost of service to the utility furnishing the energy and not by the value of the service to the purchaser, and upon its findings as to the cost of service to the Generating Company ordered that the capacity charge be reduced to $21.948 per KW. It ordered also that the escalation provision for change in the capacity charge be eliminated for the future, except with respect to increase or decrease in the federal income tax rate.

I think that the entry of the order based upon cost of service, and without reference to the use value of the current to the purchaser or the provisions of the contract under which it was furnished, was well within the power of the Commission. The manifest purpose of the of the Federal Power Act is the regulation of rates for the benefit of ultimate consumers (16 U.S.C.A. § 824(a)), and there can be no question but that the Commission has been vested with ample power of rate regulation to accomplish this purpose. Section 206(a) of the Act, 16 U.S.C.A. § 824e(a) provides:

"(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order."

And it is well settled that the Commission is given wide discretion as to the adoption and application of standards in the exercise of the power thus vested in it. In Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, the Supreme Court, speaking through Chief Justice Stone, said:

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

And in the later case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333, the Court, speaking through Mr. Justice Douglas, said:

"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. at

page 743, 86 L.Ed. 1037. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304–305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 692–693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. *And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.*" (Italics supplied).

The rate order cannot be held unjust or unreasonable in its consequences on the ground that in prescribing just and reasonable rates based on cost of service it ignores the value of the service to the purchaser, which is the basis of the contract rate. As was well said by the Commission in its opinion:

"The value-of-service approach advocated by Generating Company would result in a chaotic structure based in part upon the cost to the buyer of supplying substitute power. Such 'regulation' would, in fact, be no regulation at all and would completely disregard the public interest and the ultimate consumer which the Act is designed to protect. Cf. Phillips Petroleum Co. v. [State of] Wisconsin, 347 U.S. 672 [74 S.Ct. 794, 98 L.Ed. 1035]. Mississippi River Fuel Corp. v. Federal Power Commission, 8 Cir., 1941, 121 F.2d 159.

\* \* \* \* \* \*

"The mild prediction by Generating Company that it might exercise the recapture or cancellation provision in its contract unless it is permitted the higher rate only serves to emphasize the importance of our adherence to the cost-of-service test. The manifest purpose of the Act is the regulation of rates for the benefit of the ultimate consumer. Section 201(a). Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333]. If we were to approve the rate contained in the contract solely upon the basis that the two contracting utilities have struck a bargain, and that one of the parties would cancel the contract unless we did approve it, we would be remiss in our duty to protect the ultimate consumer. Such a rationale could lead only to approval of all contract rates irrespective of the public interest involved contrary to the provisions and purposes of the Federal Power Act."

Petitioners rely particularly upon United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388; but there is nothing in either of these decisions that supports their position. They hold merely that rates prescribed by contract cannot be raised by unilateral filing of higher rates in the absence of a finding that the public interest is affected by the lower rates—"as where it

might impair the financial ability of the public utility to continue its service",— a consideration which can manifestly have no application to a case where the rates are found to be too high in application of the cost of service principle. That the holding in these cases does not impair the regulatory power of the Commission over contract rates in a case such as this was made perfectly clear by the Supreme Court in the Mobile Gas case, supra, 350 U.S. at page 344, 76 S.Ct. at page 380, where the court said:

> "Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. * * * On the other hand, denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, *for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest.* The Act thus affords a reasonable accommodation between the conflicting interests of contract stability on the one hand and public regulation on the other." (Italics supplied).

There is nothing in the record to sustain a holding that the action of the Commission in fixing the rate in its order is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" when the cost of service principle is applied.[1] The attack here clearly relates to matters involving the exercise of the discretion vested in the Commission by Congress; and it is too well set-tled to admit of argument that as to such matters we may not substitute our judgment for that of the Commission.

The principal contention made in this connection is that, because of the circumstances under which the Generating Company was organized as a subsidiary of E & G, the entire tax deduction to which it is entitled for interest paid on bonded debt should not be deducted in computing its income but only such part as corresponds to its part of the total indebtedness of E & G and its subsidiaries. The effect of this, of course, would be to decrease the showing of income earned by the Generating Company; but such decreased showing would be contrary to fact and contrary to the established practice of the Commission in such cases. The Generating Company is a corporation separate and distinct from its parent company, E & G, and it is engaged in a separate and distinct business undertaking. The Commission cannot be held to have acted arbitrarily or to have been guilty of an abuse of discretion in holding that the income of the subsidiary, whose rates alone were being reviewed by it, should be computed on the basis of its own operations and expenses without reference to those of the parent company. With respect to this matter the Commission said:

> "With regard to the income tax allowance, Generating Company uses a hypothetical system capitalization ratio instead of its own actual ratio in order to erase the effect of higher tax costs which E & G Co. may incur as a result of the heavy debt financing of Generating Company. This is an attempt to enjoy the benefits of the high-debt financing, i. e., the construction of low cost capacity and the consequent sale to duPont, while making Georgia Power Company and ultimately the consumers in

---

1. We are authorized to set aside agency "action, findings and conclusions" in a case such as this only where they are found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence". 5 U.S.C.A. § 1009(e).

Georgia assume fictitious costs. As such, the allowance proposed by Generating Company is unreasonable.

"We have consistently held that the allowance for taxes should not exceed taxes paid. Eg., in the Matters of Michigan-Wisconsin Pipe Line Company, Docket Nos. G–1678 and G–1996, Opinion No. 275, issued July 30, 1954. Accordingly, the income tax allowance in this proceeding should be based upon the actual interest deduction of the Generating Company for that is the basis upon which it will pay its taxes."

And I do not think that the Commission's action in this respect can be held arbitrary or unreasonable or an abuse of discretion because, in determining the rate of return to be allowed on invested capital, it looked to the capital structure of E & G rather than to that of the Generating Company; but, if there is inconsistency between this and the treatment of interest on debt, it does not follow that the determination of the Commission with respect to the treatment of interest is to be condemned. The condemnation would rest rather upon allowing a return upon a greater equity invested capital than the Generating Company actually had. If this was error, however, it was error favorable to the Generating Company of which it cannot and does not complain. Certainly, the Commission cannot be held guilty of abuse of discretion in requiring that the income of the Generating Company be computed with accuracy merely because, in the company's interest, it allowed the rate of return to be based upon the E & G system capital ratio rather than upon that of the company itself.

■■ Other attacks upon the Commission's order merit but brief consideration. The fixing of the rate of return at 5.55%, instead of at 6% as contended by the company, the allowance of 6% interest on funds used during construc-tion, instead of 10%, and the allowance of a depreciation rate of 2.75% instead of 3%,—all of these were peculiarly matters for determination by the informed judgment of the Commission. See Safe Harbor Water Power Corp. v. Federal Power Comm., 3 Cir., 179 F.2d 179, 200–201; State Corp. Comm. of Kansas v. Federal Power Comm., 8 Cir., 206 F.2d 690, 713–714; Market Street Ry. Co. v. Railroad Commission of State of California, 324 U.S. 548, 559–561, 65 S.Ct. 770, 89 L. Ed. 1171. The same is true with respect to the Commission's elimination of the escalation clause from the capacity charge of the contract. It is to be noted that the escalation clause was allowed with respect to the energy charge, which does not reflect any return on a rate base. As the Commission was not required to adopt any specific formula in determining rates (Federal Power Comm. v. Hope Natural Gas Co. supra), abuse of discretion could not possibly be predicated of elimination of the escalation clause, which, when applied to the capacity charge, necessarily involves the "cost of reproduction" or the "prudent investment" principle as to some of the matters embraced within the charge. It is well settled that "prudent investment" and "cost of reproduction" are not to be accepted as exclusive tests but are merely matters to be considered in the fixing of rates. Los Angeles Gas & Electric Corp. v. Railroad Comm. of California, 289 U.S. 287, 304–308, 53 S.Ct. 637, 77 L.Ed. 1180.

In considering whether the Commission has abused its discretion in ordering the rate reduction in this case, it must be borne in mind that the basic capacity charge on the sale in interstate commerce to the Georgia Power Company was $22.50 per kilowatt, whereas the charge to duPont was $19.00 and to E & G $15.30.[2] While the question of discrimination is not before us, these figures were pertinent as bearing upon the reasonableness of the basic capacity rate,

2. Even when the duPont charge is increased under the escalation clause to $21.61 per KW, the rate is less than the $21.94 per KW rate prescribed by the Commission for Georgia Power.

which could be sustained as to Georgia Power only on the value of service theory, which the Commission very properly refused to adopt. In the light of the entire record before us, I see no basis upon which the action of the Commission can be said to be "unjust or unreasonable in its consequences" or be set aside as an abuse of discretion. See Federal Power Comm. v. Hope Natural Gas Co., supra, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333. I think, therefore, that the decision of the Commission should be affirmed.