885 F.2d 962
 107 P.U.R.4th 556
 BOSTON EDISON COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Towns of Concord, Norwood and Wellesley, Massachusetts, Intervenors.
TOWNS OF CONCORD AND WELLESLEY, MASSACHUSETTS, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Boston Edison Company, Intervenor.
 Nos. 88-1755, 88-2120.
 United States Court of Appeals,
First Circuit.
 Heard April 3, 1989.
Decided Sept. 14, 1989.
 
 James H. McGrew, with whom Carmen L. Gentile, Thomas L. Blackburn, Bruder, Gentile & Marcoux, Washington, D.C., and Wayne R. Frigard, Boston, Mass., were on briefs, for Boston Edison Co.
 Charles F. Wheatley, Jr., with whom Peter A. Goldsmith, Timothy P. Ingram and Wheatley & Ranquist were on briefs, for Towns of Concord, Norwood and Wellesley, Mass.
 Robert H. Solomon and Andre Goodson, Washington, D.C., with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Sol., were on brief, for F.E.R.C.
 Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.
 BREYER, Circuit Judge.
 
 
 1
 Boston Edison Company, a firm that generates and sells electricity, and two towns (Concord and Wellesley, Massachusetts) that buy electricity from Boston Edison, ask us to review two orders of the Federal Energy Regulatory Commission that, in relevant respects, set electricity rates from the end of 1984 through the present. FERC Opinion No. 299, March 25, 1988, 42 FERC p 61,374 (affirming and modifying opinion of the Administrative Law Judge); FERC Opinion No. 299-A, May 25, 1988, 43 FERC p 61,309 (denying rehearing). See ALJ Opinion at 34 FERC p 63,023 (1986). See also 16 U.S.C. Sec. 825l(b) (providing for appellate court jurisdiction to review FERC rate orders). The utility, on the one hand, argues that FERC made certain errors that led to rates that are too low; the Towns, on the other hand, argue that FERC made different errors that led to rates that are too high. After reviewing briefs, opinions, and the record, we conclude that, in each instance, the law grants the Federal Energy Regulatory Commission the legal power to decide the ratemaking issues as it has here decided them, see, e.g., Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287-88, 88 L.Ed. 333 (1944); and consequently we affirm FERC's Orders.
 
 
 2
 * Background
 
 
 3
 The case before us is a traditional cost-of-service ratemaking case reviewing a regulatory commission's efforts to set a utility's rates at a level that is "just and reasonable." 16 U.S.C. Sec. 824e. As in many such cases, the regulated firm, and customers who have intervened before the agency, ask us to review, and to set aside, various subsidiary findings that played an important role in determining the final rate. And, they ask us to apply traditional principles of administrative law: whether the facts are supported by "substantial evidence," 5 U.S.C. Sec. 706(2)(E), whether the Commission's policy judgments are "arbitrary, capricious, an abuse of discretion," 5 U.S.C. Sec. 706(2)(A), and whether its findings are basically consistent with its own rules and precedents. Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800, 808-09, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); National Black Media Coalition v. Federal Communications Commission, 775 F.2d 342, 355 (D.C.Cir.1985); Baltimore Gas & Electric Co. v. Heintz, 760 F.2d 1408, 1418 (4th Cir.1985), cert. denied, 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985); Greyhound Corp. v. I.C.C., 551 F.2d 414, 416 (D.C.Cir.1977); 2 K. Davis, Administrative Law Treatise Sec. 8:9 (1979). As we have previously written, "applying these standards often comes down simply to insuring 'that the Commission's judgment is supported by substantial evidence and that the methodology used in arriving at that judgment is either consistent with past practice or adequately justified.' " Distrigas of Massachusetts Corp. v. FERC, 737 F.2d 1208, 1210-11 (1st Cir.1984) (quoting City of Batavia v. FERC, 672 F.2d 64, 85 (D.C.Cir.1982)). And, in conducting this review, the Commission's expertise, as well as established rules of judicial review, require us to respect that judgment, affording it considerable legal leeway. Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); Federal Power Commission v. Hope Natural Gas Co., 320 U.S. at 602, 64 S.Ct. at 287-88.
 
 
 4
 Since the case before us involves the application of classical public utility cost-of-service ratemaking principles, we shall repeat here the rough summary of those principles that we set forth in Distrigas of Massachusetts Corp. v. FERC, supra. The regulator, roughly speaking, proceeds to determine "just and reasonable" rates as follows:
 
 
 5
 1. He selects a test year (t) for the regulated firm.
 
 
 6
 2. He adds together that year's operating costs (OC), taxes (T), and depreciation (D).
 
 
 7
 3. He adds to that sum a reasonable profit determined by multiplying a reasonable rate of return (r) times a rate base (RB). The rate base typically consists of total historical investment minus total prior depreciation. The rate of return typically reflects the coupon rate for long term debt plus a 'fair' return to shareholder equity.
 
 
 8
 4. The total equals the firm's revenue requirement (RR). The regulator then allows prices that will equate the firm's gross revenues with this revenue requirement.
 
 
 9
 These four steps can be reduced to three formulae:1. RR = OC + T + D + Profit
 
 2. Profit = r(RB)
 3. Price = RR/quantity sold
 
 10
 See generally A.E. Kahn, The Economics of Regulation (1970). This general account of ratemaking may help the reader understand to which of these formulae's terms the petitioner's claims and arguments relate and thus how they fit within the larger context of the ratemaking process.
 
 
 11
 Id. 737 F.2d at 1211. We shall review the Commission's orders applying this framework.
 
 II
 Boston Edison's Claims
 
 12
 A. Rate of Return. Boston Edison first attacks the Commission's finding that a reasonable rate of return on the common stock portion of its investment (the "fair" return to shareholder equity in step 3 and formula 2 above) was 13.73 percent for the period between November 28, 1984 through March 25, 1988, and 13.08 percent thereafter. The Commission reached that result by using a "discounted cash flow" method ("DCF"), a method that asks, "what is the minimum amount that one must pay new investors (without watering down the value of the shares of existing investors) to offer the utility the money that it needs for investment?" This amount is the minimum cost of equity capital; it pays investors a "fair return," but no more, while obtaining for the company the capital that it needs. See generally J. Bonbright, A. Danielsen, D. Kamerschen, Principles of Public Utility Rates 317-322 (1988).
 
 
 13
 To answer this question, the "DCF" method looks to see what investors have been earning on comparable equity investment; it determines what they have been earning by looking at the past price of shares, by noticing how large a dividend the shares paid, and then (through various, sometimes heroic, assumptions) adding an amount designed to reflect the "added earnings" that, in a sense, "accrued" to each shareholder in light of the fact that each shareholder expected the dividend to grow over time, reflecting the company's growth in profits. The "DCF" method then assumes that the shareholders will currently insist upon, or new investors will insist upon, that same rate of return as their minimum "price" for putting up new investment (though sometimes the regulator may make various adjustments).
 
 
 14
 Despite the precise appearance of a rate of return figure carried to two decimal places, how accurately can one measure that portion of a return to an investor that consists of likely growth in future returns? To what extent does the actual return that investors received in the past measure what they expected to receive (i.e., the "price" of their capital)? And, even if one could measure perfectly what investors insisted upon in the past as the price of parting with their money, to what extent will present or future investors insist upon the same (for economic conditions can change rapidly)? Given these uncertainties, it is not surprising that FERC's staff, looking at past returns in the form of dividends and expected growth in return came to one conclusion about the "cost" of equity capital as of approximately 1985, namely 14.11 percent; Boston Edison came to another conclusion, namely 15.25 percent; and the Administrative Law Judge, finding a "zone of reasonableness" between 14.11 percent and 15.08 percent, set the rate of return on equity judgmentally, at 14.84 percent.
 
 
 15
 Subsequently, FERC made two adjustments, the first by disregarding some of the earlier data that led to the FERC staff and Boston Edison estimates, and the second, by taking into account, for rates set after March 1988, a general decline in interest rates (as reflected in declining rates for government securities), a fact that suggests investors would not insist upon as high a price for investing their money after 1988 as they did in 1985.
 
 
 16
 Boston Edison does not object to the "DCF" method, but it does object to the two "adjustments" that the Commission made after the ALJ reached its decision.
 
 
 17
 1. Six Month Dividend Data. The studies that the ALJ used to set the rate of return based their recommendations upon one year's worth of "dividend data." Presumably, the studies (and the ALJ) looked to the dividends investors actually received, comparing them with the price of the stock, all during a twelve-month period ending some time in 1985, in order to help determine what new investors would likely insist upon receiving in the future. The Commission, pointing to the "steady improvement in stock prices over the twelve month periods used," said it would look instead to the dividends received during the last six months of the 12-month period; and it adjusted the "zone of reasonableness" accordingly. (Since stock prices improved over the year, a set dividend was a lesser percentage of stock prices averaged over the last six months, than of stock prices averaged over the whole year, which fact, by indicating that investors were willing to accept a lower return, implies a lower cost of equity capital.)
 
 
 18
 Boston Edison says that the Commission (a) did not give it an adequate opportunity to present argument and evidence that it should not make this adjustment, and (b) acted inconsistently with its decisions in other cases. Boston Edison's first argument is unconvincing, however, given the fact that (as it concedes) FERC's staff suggested the adjustment in its brief to the Commission before the Commission's initial decision, and the Commission also provided Boston Edison an opportunity fully to argue the matter in its petition for rehearing. Market Street Railway Co. v. Railroad Commission of California, 324 U.S. 548, 561-62, 65 S.Ct. 770, 777, 89 L.Ed. 1171 (1945). See also United States v. Pierce Auto Freight Lines, 327 U.S. 515, 530, 66 S.Ct. 687, 695, 90 L.Ed. 821 (1946); CNA Financial Corp. v. Donovan, 830 F.2d 1132, 1155-56 (D.C.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988).
 
 
 19
 Boston Edison's second argument is similarly unconvincing in light of the fact that the Commission focused specifically upon its past practice, recognized that the six-month period was a shorter period than it has used in some cases, but also pointed to other decisions where it found that "the use of a 12 month moving average ... would not provide a sufficiently current estimate of the dividend yield." Order No. 442, Generic Determination of Rate of Return on Common Equity for Public Utilities, FERC Statutes and Regulations p 30,677 at 30,086 (1986). The decision to use six months here is likely consistent with FERC's prior precedent, for the wisdom of using six months, rather than, say, 12 months, depends upon balancing such factors as the risk that aberrations will unfairly distort the results of a shorter time period against the risk that the longer time period will inappropriately weight the earlier results in a changing market. These, and other relevant factors may dictate different results in different cases. Regardless, the law simply requires a commission, wishing to depart from a prior rule or prior precedent, to focus on the departure, to decide to change, and to explain why it has done so. Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade, 412 U.S. at 808-09, 93 S.Ct. at 2375 (when departing from prior rule agency must clearly set forth basis for its action); Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34 (1st Cir. 1989); National Black Media Coalition v. Federal Communications Commission, 775 F.2d at 355 ("if the agency wishes to depart from its inconsistent precedent it must provide a principled explanation for its change of direction."). The Commission here has said that the rising stock market led it to use the later six months as more accurately reflecting current investor needs. That reason offers sufficient explanation. And, the explanation seems perfectly reasonable.
 
 
 20
 2. The Treasury Bond Adjustment. The Commission made a second adjustment applicable to the rate of return for the period after March 25, 1988. The Commission believed that because interest rates had fallen and stock prices had risen between 1985 and 1988, the rate of return based upon dividend yields (and other factors) in 1984-85 overstated the cost of equity capital. It therefore adjusted the rate of return downwards as follows: (a) It took the interest rate paid by Government 10-year bonds during the six-month period ending in April 1985 (the period the staff had used to calculate the rate of return); it noted that the rate was 11.54 percent. (b) It took the return that the same bonds yielded in the most recent six month period (September 1987 to March 1988); that rate was 8.95 percent. (c) It subtracted the second figure from the first, which resulted in a difference of 2.59 points. (d) It subtracted the 2.59 points from the rate of return it had calculated based upon its adjusted 1985 figures (13.73 percent), leaving 11.14 percent. (If one assumes that the returns utility investors would insist upon declined just as did treasury bond returns, then the cost of utility equity capital would also have declined by 2.59 points.) (e) It pointed out that the resulting figure (11.14 percent) was lower than the lower bound of the "zone of reasonableness." So, it picked the lower bound of that zone, 13.08 percent (the result of the staff's "discounted cash flow" calculation, as adjusted by using six months of 1984-85 data instead of a year's worth of data). And, it held that it would consider that 13.08 percent figure as the cost of equity capital for rate setting purposes after March 25, 1985.
 
 
 21
 Boston Edison first argues that the Commission's decision to use the treasury bond data violates the Administrative Procedure Act's requirement that
 
 
 22
 When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.
 
 
 23
 5 U.S.C. Sec. 556(e). Boston Edison does not dispute the accuracy of the "material fact" in question, however, namely the relevant treasury bond interest rates. Moreover, the Commission gave Boston Edison an adequate opportunity to argue against the adjustment or any other factual matter in its petition for rehearing. United States v. Pierce Auto Freight Lines, 327 U.S. at 530, 66 S.Ct. at 695; Market Street Railway Co. v. Railroad Commission of California, 324 U.S. at 561-62, 65 S.Ct. at 777; CNA Financial Corp. v. Donovan, 830 F.2d at 1155-56. See also United States v. Abilene & Southern Railway Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 (1924).
 
 
 24
 Boston Edison next argues that it is unreasonable for the Commission to adjust the rate of return for changes in interest rates: it says utility investors do not react in precisely the same way as treasury bond holders; thus a fall in treasury rates does not automatically mean that required utility equity returns have fallen similarly. (And, Boston Edison included in its brief to the Commission, as it has included here, some cost data suggesting differences.) The Commission, however, "frequently adjusts the return [on equity] ... when warranted by changing circumstances in the financial markets after the close of the record since such information is not typically subject to dispute." Mississippi Industries v. FERC, 808 F.2d 1525, 1568 (D.C.Cir.1987), cert. denied, 484 U.S. 985, 108 S.Ct. 500-01, 98 L.Ed.2d 499 (1987). And, we can find nothing unreasonable about making such an adjustment. The short answer to Boston Edison's claim that utility investors do not react precisely the same way as investors in treasury bonds, is that the drop in interest rates here was substantial (nearly 25 percent) but the Commission adjusted its rate of return downward by only 0.65 points (less than 5 percent), certainly not an unreasonably large downward adjustment. Boston Edison has not explained how the material it submitted to the Commission showed that some significant downward adjustment to reflect lower interest rates was inappropriate. And, even if we assume, for the sake of argument, that changes in reasonable utility share returns do not exactly track changes in bond interest rates, the Supreme Court has made clear that "infirmities" in Commission methodology are "not ... important," provided that the "result reached," the "impact of the rate order," cannot "be said to be unjust and unreasonable." Federal Power Commission v. Hope Natural Gas Company, 320 U.S. at 602, 64 S.Ct. at 287-88. In our view, some downward adjustment in light of the significant change in interest rates was perfectly reasonable.
 
 
 25
 Finally, Boston Edison argues that the use of treasury bond data in this case is inconsistent with Commission practice in other cases. But, as we have pointed out, the Commission in other cases has adjusted rates of return to reflect changes in market returns. Whether, and the extent to which, it should do so, obviously depends upon the extent of the change and its likely permanence; and, taking that fact into account, we can find no inconsistency with prior FERC cases. Compare Air Products & Chemicals, Inc. v. FERC, 650 F.2d 687, 697 (5th Cir.1981) (if agency takes official notice of facts not appearing in the record, it must disclose contents or "specify what is involved" so as to allow "adversarial comment and judicial review"); United States Lines, Inc. v. Federal Maritime Commission, 584 F.2d 519, 533 (D.C.Cir.1978) (failure by agency to identify data relied upon precludes effective judicial review).
 
 
 26
 B. Sales Data. Reference back to Step Four in our simplified account of rate setting, p. 964, supra, reveals that, after determining the utility's revenue requirement, the regulator must determine the amount of power the utility will likely sell (so that the regulator can set a per unit price that, when multiplied times the units of power sold, say, to Concord and Wellesley, will equal their proportionate share of the utility's revenue requirement). In this case Boston Edison submitted to the ALJ an estimate of the amounts it expected to sell (in 1984-1985), which estimate it had compiled in January 1984. The ALJ, however, found that Boston Edison had prepared another study in July 1984 that suggested sales would grow faster than its January study indicated (thereby suggesting that a lower price would yield the necessary revenue, provided, of course, that costs did not increase proportionately). The ALJ noted that in Delmarva Light & Power Company, 24 FERC p 61,199 (1983), FERC said that utilities must submit estimates which are reasonable at the time of filing (in this case, September 1984) even if doing so delayed the filing. And, the ALJ held that the January sales estimate was not "reasonable." The ALJ used the July study to estimate sales; but the ALJ nonetheless used Boston Edison's cost figures (related to the earlier January sales estimate) because, in his view, the utility "failed to demonstrate that in July 1984" the cost figures it had submitted "were understated, thereby offsetting in whole or in part the increased revenues contemplated by the July 1984 sales data." FERC affirmed the ALJ's finding, but,
 
 
 27
 on the narrow basis that Edison failed to substantiate the claim that any necessary adjustments to other cost-of-service items could not have been accomplished during the interval between the July 1984 revision to the sales forecast and the September 1984 filing date.
 
 
 28
 Boston Edison concedes that the July sales estimate is significantly more accurate than the January estimate. But, it argues that the Commission could not lawfully base rates on that July sales estimate without, at the least, adjusting cost figures to correspond to the July, rather than the January estimated sales figures. First, Boston Edison says that the only evidence the record contains is evidence that, as a practical matter, it could not have worked up "July sales estimate based" cost figures in time for the September filing; thus FERC had to assume that was so (in which case, because of other things FERC has written, perhaps it had to use them). But, in our view, FERC did not have to assume that was so. We concede that the only evidence consisted of a statement to that effect by a company witness; but, given the ALJ's expertise, and the known ability of computers, the ALJ could reasonably have wondered why it was so. He might have asked himself why computers could not have adjusted costs to produce changed cost figures that would correspond to changes in sales estimates. And he might have wondered why this could not be done in a few hours and certainly within the two-month period between July (when the new sales estimates appeared) and September (when the utility filed its new proposed rates). Given the reasonableness of this question, the ALJ might reasonably have concluded (as did FERC) that Boston Edison's conclusory testimony did not "substantiate" the fact that it could not have worked up "July sales estimate based" cost figures in time for the September filing. And this lack of substantiation seems to us adequate justification for FERC's refusing to accept this utility witness's conclusory statement as conclusive.
 
 
 29
 Boston Edison adds that the ALJ prevented it from introducing additional evidence. But, when we checked the record citations provided, we discovered that Boston Edison had simply asked to introduce evidence to refute a statement made by a witness for the Towns that someone at Boston Edison had told him that the reason Boston Edison had not updated the cost information was not its inability to do so, but the fact that Boston Edison gave the matter low priority. (All sides dropped the matter when the towns agreed that the ALJ should not take account of this statement.) This argument about a hearsay statement was not, in any meaningful sense, an argument about introducing additional evidence substantiating the "impracticality" claim.
 
 
 30
 Second, Boston Edison claims that it is "arbitrary," and unreasonable for the Commission to use the July sales figures but the January-based cost figures. In our view, however, whether it is, or is not, "arbitrary" and unreasonable would depend upon the Commission's expert judgment about how much this difference will likely be, how much it would likely matter, how complicated it would be to update the cost data, and how wrong it was for Boston Edison not to update the information itself in the first place. We can simply state our conclusion, resting upon our reading of the record and hearing the arguments, that Boston Edison has not shown that the Commission exceeded the bounds of what is reasonable; it has not shown the rate difference, overall, would be so great, that the added administrative burden would be so small, or that it is so little at fault, that a reasonable regulator could not reasonably decide to take its later sales estimates and combine them with cost estimates of a few months before.
 
 
 31
 Third, Boston Edison says that it is particularly unreasonable for FERC to use "extra record" information (the treasury bond returns) to diminish the "equity cost" figure, but to refuse to look to "extra record" information to increase the "sales related" cost figures. To make this argument, however, is to compare apples with oranges. FERC did the first because it found the difference in interest rates highly significant, and there is no question about the information's accuracy; FERC did the second because it believed Boston Edison primarily at fault for failing to use the later sales figures and adjust them itself. The question, in each instance, is whether FERC behaved reasonably; and, we can only repeat that, given the leeway the law permits FERC in respect to such decisions, we must conclude that it did.
 
 III
 The Towns' Appeal
 
 32
 The Towns make several arguments that we believe are not substantial. We shall indicate, only briefly, our reasons for rejecting them.
 
 
 33
 1. The Towns remind us that FERC found that average treasury bond interest rates declined by 2.59 points between April 1985 and February 1988, that FERC recognized that subtracting this figure from what it had determined to be the fair rate of return on equity as of April 1985 would yield a figure of 11.14 percent, but, instead of finding that the post-February 1988 fair rate of return on equity was 11.14 percent, FERC set that figure at 13.08 percent, the "lower bound" of, what it called, the "zone of reasonableness." The Towns argue that FERC should have set the rate at 11.14 percent, rather than choosing the higher, 13.08 percent, figure.
 
 
 34
 The problem with the Towns' argument is that we cannot find any principle of law that required FERC to set the rate at 11.14 percent. Ratemaking, particularly in respect to determining the cost of equity capital, is not a science. Rather, commissions must, in the end, decide the level of such costs, using models (such as the "discounted cash flow" model) or related rates of return (such as interest rates on government bonds) to inform, not rigidly to determine, their judgment. We have already explained why FERC might reasonably look to changes in treasury bond interest rates between 1985 and 1988 as providing a basis for lowering the cost of equity capital, in the face of Boston Edison's argument that utility investors' insistence upon particular rates of return does not vary in precisely the same manner as the insistence of those who buy treasury bonds. See p. 967, supra. For roughly similar reasons, i.e., that the Commission might reasonably decide that treasury bond declines, while informative, were not (in respect to precise amounts) determinative, FERC could continue judgmentally to maintain that the staff's 1985-based results constituted a floor (a lower bound of reasonableness) below which it would not go. Given the administrative difficulties in deciding a major rate case, in which future rates reflect present costs as determined by record evidence about the past, and the judgmental nature of the task, we simply cannot see that FERC's refusal to set a lower rate is so unreasonable as to be unlawful. 5 U.S.C. Sec. 706(2)(A). And, we have found no case holding to the contrary. Cf. Federal Power Commission v. Hope Natural Gas Company, 320 U.S. at 602, 64 S.Ct. at 287-88 ("Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling.... If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end.").
 
 
 35
 2. The Towns argue that FERC should not have included in Boston Edison's costs certain costs related to its plans to build the Pilgrim II nuclear power plant, costs incurred after June 1980 but before September 1981 when Boston Edison decided to cancel its building plans. In the Towns' view Boston Edison's expenses after June 1980, were not prudently incurred and therefore not recoverable from the ratepayers. The issue, however, was fully tried before the ALJ. The Towns strongly argued that FERC should follow the lead of the Massachusetts Department of Public Utilities and hold that expenditure after June 1980 was not prudent; Boston Edison produced testimony of executives who explained their reasons for not cancelling the plant before September 1981. The ALJ accepted the testimony of Boston Edison's witnesses; and, agreed with Boston Edison. Having read that testimony, and recognizing that this type of question is one that commissions, not courts, must decide, we find the ALJ's (and hence FERC's) conclusion adequately supported. See 5 U.S.C. Sec. 706(2)(A), (E) (agency action may be set aside if "arbitrary, capricious, [or] abuse of discretion," or "unsupported by substantial evidence").
 
 
 36
 3. The Towns point out that the ALJ's decision (affirmed by the Commission) permits Boston Edison to recover the money it spent on Pilgrim II over a period of 11.6 years, at the rate of about $12.5 million per year. The Towns say that this rate is unreasonably high because its impact on ratepayers amounts to a rate increase of 3.23 percent. The Towns add that the Commission has previously spoken of the need to permit a utility to write off losses "consistent with a reasonable impact on the ratepayers," and avoiding "an excessive impact on the ratepayer." Montaup Electric Co., 39 F.E.R.C. p 61,379, 62,229-30 (1987). And, they point out that the highest rate impact that FERC has previously approved amounted to 1.4 percent.
 
 
 37
 It is up to the Commission, however, to decide recovery amounts, time periods and rate impacts. The Commission has never said that the 1.4 percent figure is binding. Indeed, its prior cases all involved recovery periods of 5 to 10 years; here it has required amortization over 11.5 years. Given the large amount of sunk costs and the length of the recovery period, we cannot say that an impact-on-rates figure of 3.4 percent is unreasonable.
 
 
 38
 4. The Towns point out that the ALJ had to decide how Boston Edison should set aside money over the years to make certain it has funds available to "decommission" its Pilgrim I plant in the year 2008. Boston Edison presented three alternatives: (a) dismantling in 2008; (b) "entombment" in 2008 followed by dismantling forty years later; (c) "mothballing" in 2008 followed by dismantling forty years later. The first method is more expensive initially; the other two methods are cheaper initially, but more expensive once one adds in their later costs. Which method is cheaper overall depends upon the rate at which one assumes money invested over the years will grow over time. The ALJ decided that the first method was cheaper because he concluded that the money set aside over the years would not grow at all in real terms; he recognized that Boston Edison would invest this money and that the investments would pay interest; but he concluded that inflation would offset the interest payments, so that there would be no real growth in the funds. The Towns argue that this latter assumption is unreasonable.
 
 
 39
 We confess that it seems odd to assume that Boston Edison will invest money in ways that will earn no real return whatsoever. Yet, we must also acknowledge that there is evidence to this effect in the record. Ultimately, we note that the ALJ conservatively concluded that "no basis exists at this time for imputing a growth factor to the Pilgrim I decommissioning fund." He added that
 
 
 40
 Should a positive growth trend appear to develop with the additional years' data in future cases, then an appropriate adjustment could be made at that time.
 
 
 41
 Given these qualifications, and the record evidence, we cannot say that the ALJ's conclusion (affirmed by the Commission) was unreasonable or inadequately supported.
 
 
 42
 5. The Towns argue that the ALJ should not have provided Boston Edison with an allowance for "working capital." The ALJ did so on the basis of prior precedent that permitted him to assume that the utility needed working capital equivalent to about 45 days of annual expenses, with certain adjustments made where the firm shows special needs because of special "lags" or "leads" in payment dates for, say, fuel or purchased power. The Towns claim that the ALJ should have imposed a higher burden of proof upon the utility to show a need for working capital; a burden that FERC more recently adopted by rulemaking. See Calculation of Cash Working Capital Allowance for Electric Utilities, FERC Statutes and Regulations, Proposed Regulations 1982-1987 p 32,373 (1984). The conclusive answer to this claim, however, is that FERC's new rule was not in effect at the time it reached a decision in this case; and it was not unreasonable to apply the new rule prospectively only; indeed, that is how most rules apply. See NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). We also find adequate the evidence introduced in support of Boston Edison's claims for special, i.e., non-45 day, treatment of certain "leads" and "lags."
 
 
 43
 In sum, to accept any of the parties legal claims in this case would amount to "second guessing" the Commission as it fulfills its statutory duties, duties which require the exercise of its special expertise, and duties which the law entrusts primarily to the Commission, not to the courts. We have not found the Commission's decisions before us unreasonable, inadequately supported by the evidence, or otherwise not in accordance with law. Its decision therefore is
 
 
 44
 Affirmed.